STATE *v.* FRED BAKER.

(53 A2d 53)

February Term, 1947.

Present: MOULTON, C. J., SHERBURNE, BUTTLES, STURTEVANT and JEFFORDS, JJ.

Opinion filed May 6, 1947.

*Frederick W. Wakefield* for the respondent.

*Clarke A. Gravel,* State's Attorney, for the State.

SHERBURNE, J. This is a prosecution for first degree arson. From a verdict and judgment of guilty the respondent has excepted.

Viewing the evidence most favorably to the State the following facts appeared: For a few months prior to April 29, 1946, the respondent and a Mrs. Bailey had been residing in a rented house in the City of Burlington. He owned the furniture and carried fire insurance upon it to the amount of $1000.00. Shortly after one o'clock in the morning of April 29, 1946, Mrs. Bailey came out of the house and immediately went back in, then she and the respondent came out, shut the door, and got into respondent's automobile standing in the driveway to the house, and backed the car out and in doing so bumped against a tree standing near the

driveway hard enough to make a loud noise and to knock some bark off the tree. They then drove away. Within two or three minutes after they left, the house was observed to be on fire, and in a few minutes more a neighbor rang in a fire alarm which was received at the fire station at 1:28 A. M. The fire trucks came promptly, and the fire was put out after it had damaged the house to the amount of $300.00 and the furnishings to the amount of $200.00. The respondent and Mrs. Bailey returned after the fire had been put out, but before the fire trucks had left. The fire was in a corner of a shed room of the house, where there was a bin that had had some fire wood and paper in it. In this room there were found a lot of paper, shavings, straw mats, an empty oil drum, and a full five gallon can of gasoline near where the fire had burned. There was nothing in the room that might of itself have started the fire. Early in the morning after the fire had been put out the respondent told the chief of the fire department that he was last in the house and left it between 8:30 and 9 o'clock of the previous evening. Mrs. Bailey told him that she left the house not later than 10:30 that evening. In the morning of the next day, April 30, the deputy State fire marshal came to the house and the respondent, in the presence of Mrs. Bailey, told him that in the afternoon of April 28, he and Mrs. Bailey were at the Sand Bar Bridge fishing, and while there met an acquaintance of his. They returned home in the vicinity of 7:30 or 8 in the evening, and cooked and ate their fish. They then left the house at around 9 o'clock to return to fishing at Sand Bar Bridge and to see if they could find this acquaintance, and when they didn't find him they decided it was too cold to go fishing and returned to Burlington, getting to the house after the fire was out and when the fire department was getting ready to leave. Mrs. Bailey corroborated this statement. In the evening of April 30, the respondent was sworn and questioned at an investigation conducted by the deputy fire marshal. When first so questioned he gave substantially the same account that he had given in the morning. Later, toward the close of the investigation, he voluntarily and freely changed his account of the happenings immediately before the fire, and testified that he did not leave the house on the evening before the fire at 9 o'clock and go fishing; that he was in the room adjacent to the living room and smelled smoke and Mrs. Bailey told

him something was burning; that they both went out of the house immediately, jumped into the car, backed out of the drive way, striking the tree as they went, and drove away toward Mallets Bay. He testified that he did not ring in a fire alarm and made no attempt to telephone the fire department, and that he didn't know why he drove out to Mallets Bay after discovering the fire. He also testified that he had had some talk with an insurance adjuster, and that the loss on his furniture had been adjusted but not paid.

At the conclusion of the State's case the respondent moved for a directed verdict on the ground that there was no evidence that the respondent set the fire with the intention of setting it. The motion was overruled, subject to exception, and the respondent then rested without introducing any evidence.

 The mere fact of the burning of a building is not sufficient to establish the corpus delicti, for if nothing more appears it will be presumed that the fire was the result of accident or some providential cause, rather than the result of a criminal design; but the incendiarism may be proved by circumstantial evidence. *State* v. *Lizotte,* 109 Vt 378, 385, 197 A 396. Since the evidence that the fire was incendiary and that the respondent set it is entirely circumstantial, the circumstances proved must do more than create a mere suspicion, however strong. *State* v. *Goodhart,* 112 Vt 154, 158, 22 A2d 151; *State* v. *Foss,* 110 Vt 453, 458, 8 A2d 648; *State* v. *Rounds,* 104 Vt 442, 449, 160 A 249. The circumstances shown must exclude every reasonable hypothesis except that the respondent is guilty. *State* v. *Levy,* 113 Vt 459, 461, 35 A2d 853; *State* v. *Goodhard, supra; State* v. *Boudreau,* 111 Vt 351, 360, 16 A2d 262; *State* v. *Foss, supra; State* v. *Bean,* 77 Vt 384, 403, 60 A 807.

 The evidence tends to show that the respondent left the house hurriedly and drove away after he smelled smoke and was told that something was burning and stayed away until the fire was put out. When inquired of as to his whereabouts just before the fire he gave false answers. When asked why he drove out to Mallets Bay after he had discovered the fire he said he didn't know. These were incriminating circumstances and show a consciousness of guilt. *State* v. *Stacy,* 104 Vt 379, 407, 160 A 257, 747; *Girard* v. *Vt. Mut. Fire Ins. Co.,* 103 Vt 330, 337, 338, 154 A 666, cases

of false statements as to whereabouts; and *State* v. *Dugee,* 101 Vt 491, 494, 144 A 689, a case of unexplained flight immediately after the commission of an alleged offense. Taking also into consideration that the house was observed to be on fire almost immediately after the respondent drove away, his indifference as to what would happen to the house, and that, although he owned the furniture upon which he carried insurance, he made no attempt to call the fire department or to put the fire out, and that in his haste to get away he backed into the tree, and also the location and the nature of the fire and the inflammable nature of the things near the fire, we think that the circumstances create more than a mere suspicion, and that they exclude every reasonable hypothesis except that the fire was incendiary and that the respondent is guilty of setting it. The motion for a directed verdict was properly denied.

During argument the State's Attorney commented upon the failure of the respondent to testify, and the court charged the jury that, "although the respondent does not have to take the stand unless he sees fit to do so, if he fails to testify, that may be a matter of comment to the jury and the jury may draw reasonable inferences therefrom." To such argument and charge the respondent excepted. He claims that our statute allowing comment contravenes Chapter I, Article 10 of our Constitution, "That in all prosecutions for criminal offenses, a person hath a right to be heard by himself and his counsel; * * * nor can he be compelled to give evidence against himself; * * * *"

The foregoing provisions of our Constitution, except for the substitution of the word "person" for the word "man" in 1793, were incorporated into our first Constitution in 1777. By No. 40 of the Acts of 1866, it was provided:

> "In the trial of all indictments, complaints, informations and other proceedings against persons charged with crimes or offenses, the person so charged shall, at his own request and not otherwise, be deemed a competent witness, the credit to be given to his testimony being left solely to the jury, under the instructions of the court; but the refusal of such person to testify shall not be considered by the jury as evidence against him."

Before the enactment of this Act a respondent on trial in this State was not a competent witness. The provisions of this Act without material change have been retained in all subsequent revisions of our statutes, and were reenacted by P. L. 2383. In May, 1931, the American Law Institute by a vote of 91 to 53 approved a resolution that "the judge, the prosecuting attorney and counsel for the defense may comment on the fact that the defendant did not testify." Vol. IX of Proceedings, pages 202 to 218. At the annual meeting of the American Bar Association held in September, 1931, a law was recommended by a vote of 280 to 183 by which the prosecution would be permitted to comment to the jury on the fact that the defendant did not take the stand as a witness. 56 Reports of American Bar Association, pages 137 to 159. At the 1934 meeting of the Association the matter was again taken up, and a law was recommended permitting court and counsel to comment to the jury on the failure of a defendant in a criminal case to testify in his own behalf. 59 Reports of American Bar Association, pages 130 to 141. At the 1934 meeting of the Vermont Bar Association its legislative committee referred to the action recommended by the American Bar Association, and recommended that P. L. 2383 should be amended to read substantially as it was amended at the next session of the General Assembly by No. 52 of the Acts of 1935. This recommendation was adopted. 28 Vermont Bar Association Proceedings, pages 120 to 129. P. L. 2383 as so amended reads:

> "In the trial of complaints, informations, indictments and other proceedings against persons charged with crimes or offenses, the person so charged shall, at his own request and not otherwise, be deemed a competent witness, the credit to be given to his testimony being left solely to the jury, under the instructions of the court but the failure of such person to testify may be a matter of comment to the jury and the jury may draw reasonable inferences therefrom."

The constitutional validity of No. 52 of the Acts of 1935 depends upon the meaning which the words "nor can he be compelled to give evidence against himself" bore in 1777, when they were included in our Bill of Rights. Nothing in the Federal Con-

stitution applies. *Twining* v. *New Jersey,* 211 US 78, 29 S Ct 14, 53 L Ed 97. In construing our constitutional provision its historical setting is of the first importance.

In 1938 the Massachusetts Senate asked the opinion of the Supreme Judicial Court if it was competent for the General Court to enact legislation, as set 'forth in a senate bill, providing that under certain circumstances the neglect or refusal of a defendant in a criminal proceeding to testify may be made the subject of comment on his trial, notwithstanding the provision of Article 12 of Part I of the constitution of that commonwealth adopted in 1780, which provides that "No subject shall * * * be compelled to accuse, or furnish evidence against himself." The answer was given in *Opinion of the Justices,* 300 Mass 620, 15 NE2d 662, 665. The Majority answered "No.", but Mr. Justice Lummus answered "Yes". We are favorably impressed by the reasons given by the latter for his conclusions, and adopt his statement of the historical setting as follows:

"No one in 1780 could foresee that criminal defendants, almost a century later, would be given the right to testify. * * *

"The evil against which the words in question were directed was experienced most recently and strikingly during the reign of Charles I. See 4 Wigmore, Evid. (2d ed.) § 2250, II, 3, 4, and notes 107, 112. In part it resulted from the denial, to a person accused of felony, of the assistance of counsel. Although in Massachusetts the right to counsel was established in 1780 by the very article under discussion (*Commonwealth* v. *Stewart,* 255 Mass 9, 16, 151 NE 74, 44 ALR 579) and may have been recognized earlier (St. 1697, c. 9, § 11), in England counsel were first allowed in trials for treason in 1695 (St. 7 Wm. III, c. 3, § 1), came to play minor parts in other trials, and were admitted to defend in felonies generally in 1836 by St. 6 & 7 Wm. IV, c. 114, § 1. 9 Holdsworth, Hist. Eng. Law (1926), 235. Modern judges who have heard criminal defendants conduct their cases without the aid of counsel know that their efforts often result in a jumble of cross-examination, unsworn assertion, and argument upon the evidence. In the early seventeenth century and before, a criminal trial was in great part a protracted wrangle between counsel for the prosecution and the defendant. This is vividly

portrayed by Stephen (1 Hist. Crim. Law, 325, 326), quoted in *Twining* v. *New Jersey,* 211 US 78, 103, 29 S Ct 14, 53 L Ed 97. See also 9 Holdsworth, Hist. Eng. Law (1926), 225-235.

"The almost inevitable furnishing of evidence by a criminal defendant conducting his own defense at a time when the law of evidence was in its infancy, was aggravated by the adoption of the inquisitorial system which became the accepted practice of the Court of Star Chamber in criminal cases. 4 Wigmore, Evid. (2d ed.) § 2250, I, 2 (b), page 806. Stephen says (1 Hist. Crim. Law, 342), 'In the old Ecclesiastical Courts and in the Star Chamber it (the ex officio oath, to make true answers to all questions) was understood to be, and was, used as an oath to speak the truth on the matters objected against the defendant—an oath, in short to accuse oneself.' The controversy over this oath reached its peak in Lilburn's Trial, 3 How. St. Tr. 1315, in 1637. As a result, in 1641 the Court of Star Chamber was abolished, and the use of such an oath in penal cases was forbidden. St. 16 Car. I, cc. 10, 11. 4 Wigmore, Evid. (2 ed.) § 2250, I, 3, page 808.

"That controversy had its effect upon the common law courts, in which until about 1640 confessions induced by torture were constantly accepted as evidence. 2 Wigmore, Evid. (2d ed.) § 818 (3) ; 5 Holdsworth, Hist. Eng. Law (1924), 185-187, and accused persons were compelled to submit to an examination before trial, the results of which were put in evidence. 4 Wigmore, Evid. (2d ed.) § 2250, II, 1, 2. Authorities are collected in 30 Mich. Law Rev. (June, 1932) 1224, 1231 et seq. During the time of Charles II, the general privilege against self-crimination became established, and the 'extension of the privilege to include an ordinary witness, and not merely the party charged, is for the first time made.' 4 Wigmore, Evid. (2d ed.) § 2250, II, 3. *Emery's Case,* 107 Mass 172, 181, 9 Am Rep 22."

Even as late as the middle of the last century an interested person or party to a civil suit was not considered a competent witness. The theory of disqualification by interest is reduced by Prof. Wigmore to a syllogism, both premises of which were in the 1700s accepted as axioms of truth: "Total exclusion from the stand is the proper safeguard against a false decision, whenever the persons offered are of a class specially likely to speak falsely;

persons having a pecuniary interest in the event of the cause are specially likely to speak falsely; therefore such persons should be totally excluded." As late as 1824 Mr. Starkie, Evidence 83, supports this theory. As Prof. Wigmore shows, both premises of the syllogism are unsound. Pecuniary interest does not necessarily raise any large probability of falsehood, and even if it did, the risks of false decision are not best avoided by excluding such testimony. The change in public opinion began with the publication of Jeremy Bentham's Rationale of Judicial Evidence in 1827. Wigmore, Evidence, (3d ed.) § 576. By No. 13 of the Acts of 1852 Vermont made interested persons and parties competent witnesses in civil suits. Finally defendants in criminal cases were made competent witnesses at their own request in 1866 as we have seen.

The disqualification of the accused in criminal causes to testify for himself seems not to have been questioned in policy until Bentham's time, but his arguments in this respect took longer for their fruition than his other proposals. The reason for the general slow arrival at this measure did not apparently lie entirely in a failure to perceive the fairness of giving the accused an opportunity to tell his story in exculpation. This must have been appreciated as soon as any perception was reached of the impropriety of excluding parties and other interested persons. That the formal grant of competency, then, was so long withheld was due rather to a hesitation founded on the supposed advantage of the accused himself. His failure to use the right of testifying would (it was believed) damage his cause more seriously than if he were able to claim that his silence was imposed by law. But, chiefly, his exercise of the right to testify would (it was believed), in subjecting him to the ordeal of cross-examination, place him in a situation in which even an innocent man would show at a disadvantage, and would injure more than assist his own cause. Wigmore, Evid. (3d ed.) § 579. The latter belief is aptly illustrated in the opinion in our case of *State* v. *Cameron,* 40 Vt 555, 565, decided only a year after the enactment of the Act of 1866, and 15 years after the enactment of the Act of 1852, from which we quote: "The courts in this State not having usually followed the old English practice of calling upon the prisoner to make his statement to the jury, and there being a certain class of cases in which a prisoner

might be benefited by testifying, the statute has awarded him this privilege with a view to its being used in such exceptional cases. In the great body of cases no wise practitioner would permit his client, whether he believed him guilty or innocent, to testify when upon trial on a criminal charge. The very fact that he testifies as if with a halter about his neck, that he is under such inducement to make a fair story for himself, his character and his liberty if not his fortune and his life being at stake, is enough to usually deprive his testimony of all weight in his favor, whether it be true or false. This is the case even when his manner upon the stand is unexceptionable, while his critical condition often creates such apprehension and excitement that his manner is open to great criticism, and if he does make a mis-step after voluntarily assuming the responsibility of testifying, it will naturally be construed strongly against him. In short, his testimony is far more likely to injure him seriously than to help him a little. It is true that a clear intellect and perfect self-possession may enable an unscrupulous rogue to run the gauntlet of a cross-examination and make something out of this privilege, and the same qualities will be still more likely to help an innocent man to some advantage from it, but the true application of the statute is only to those rare cases, when a word from the prisoner, and him only, will manifestly dispose of what otherwise seems conclusive against him." Similar apprehensions are expressed in *People* v. *Tyler,* 36 Cal 522, decided in 1869, and in *Ruloff* v. *People,* 45 NY 213, decided in 1871.

Experience has shown that these apprehensions are unfounded so far as any disadvantage from taking the stand is concerned. The innocent respondent has nothing to fear. Cross-examination does not shake a truthful witness. Even in the case of a respondent with mental or language deficiencies, or with a prior criminal record which may affect his credibility as a witness, if his counsel will bare these in his direct examination, rather than wait to have them shown upon cross-examination, the jury will give him fair consideration if his testimony rings true.

These apprehensions, together with the hold over of the belief that an interested person or party could not be believed by the jury, doubtless were the reason for introducing into the statutes making the accused a competent witness provisions like those in our original statute, that his refusal to testify should not be con-

sidered by the jury as evidence against him, and may have influenced many of the state courts in construing their constitutional provisions against self-crimination. As shown in Wigmore, Evid. (3d ed.) § 2272, almost universal legislation in the United States decreed that an inference should not be drawn from a person's exercise of his privilege not to testify, and only by a few courts and constitutions and statutes was the inference permitted to be drawn. In our case of *State* v. *Cameron, supra,* the Court said: "By the express terms of the statute as well as the fair interpretation of the Constitution it is forbidden." This was dictum so far as the Constitution is concerned, in view of the provisions of the statute. On the other hand, in Maine, a statute (Acts of 1864, c. 280) providing that a person charged with the commission of a crime "shall at his own request, but not otherwise, be deemed a competent witness", was held not to contravene the constitutional provision (Const. Maine, Art. 1, § 6) that the accused "shall not be compelled to furnish or give evidence against himself", and, until a statute (Maine St. 1879, c. 92) changed the law, that an inference might be drawn against him from his failure to testify. *State* v. *Bartlett,* 55 Me 200; *State* v. *Lawrence,* 57 Me 574; *State* v. *Cleaves,* 59 Me 298, 8 Am Rep 422. In New Jersey, although no constitutional provision exists, the substance of our constitutional provision against self-crimination is part of the common law of the state. *State* v. *Zdanowicz,* 69 NJL 619, 55 A 743; *State* v. *Miller,* 71 NJL 527, 60 A 202. Yet the failure of a criminal defendant to exercise his statutory right to testify has been held in many cases, of which only three are cited, to give rise to an inference against him. *Parker* v. *State,* 61 NJL 308, 39 A 651, affirmed in 62 NJL 801, 45 A 1092; *State* v. *Twining,* 73 NJL 683, 64 A 1073, 1135, affirmed in *Twining* v. *New Jersey,* 211 US 78, 29 S Ct 14, 53 L Ed 97; *State* v. *Kisik,* 99 NJL 385, 125 A 239. After many years of experience the legislative trend is toward allowing the inference to be drawn. California and Ohio have amended their constitutions. Connecticut, which has a constitutional provision against self-crimination, has amended its statute, and it has been several times held, the last time in *State* v. *Hayes,* 127 Conn 543, 18 A2d 895, that the jury may draw the inference. Iowa has amended its code. Wigmore, Evid. (3d ed.) § 2272, note 2. § 201 of the Model Code of Evidence recommends

it. It is probablè that some courts that early committed themselves against it, would now sustain comment if it were now a matter of first impression.

It may be that our statute puts the accused in a dilemma. But, as said by Mr. Justice Lummus, in Opinion of Justices, *supra,* "that is not the sort of compulsion against which the constitutional provision was aimed. Neither is subjecting the accused to an inference if he does not testify, the sort of self-accusation or self-crimination meant. The history of the privilege, and the weight of authority, show that the constitutional provision was directed against torture, force, and the inquisitorial practices of past centuries. It has no concern with tactical refinements." As Prof. Andrew A. Bruce, former Chief Justice of the Supreme Court of North Dakota, states in 31 Mich. Law Rev. 226, 233: "All that was in the minds of the framers of the constitutional provisions was the desire to prevent injustice and direct compulsion. Theirs was a protest against and a fear of the inquisition of torture which was even then so prevalent on the continent of Europe and which, though denied, had so often accompanied the proceedings of the Star Chamber. They, too, no doubt had in their minds the excesses which had been committed under the Statutes of Phillip and Mary when suspects, who were without the aid of counsel, were 'third-degreed' by the examining magistrates. Their protest was against compulsion and not against the reasonable inferences which might be drawn from voluntary acts or from the use of one's volition in refraining from acting."

We approve and quote the following from the dissenting opinion of Judge Bakewell in *State* v. *Wolfe,* 64 SD 178, 226 NW 116, 125, 104 ALR 464, a case where the South Dakota Supreme Court held 3 to 2 that an act somewhat like ours contravened their constitution:

"The constitutional guaranty is that no person shall be compelled in any criminal case to give evidence against himself; not that he shall not be morally coerced. There is certainly a vast difference between the two * * *. If it is moral coercion for a prosecutor to comment on the obvious fact that the accused has not testified, it is certainly the very extreme of moral coercion to confront him with his accusers and tempt him to deny their accusations. All the mechanics of a criminal trial are a form of moral

coercion tending to force testimony from the unwilling lips of the defendant. The considerations which may impel or morally coerce a person on trial to testify depend on a multitude of different circumstances, some of which, as for example, the desire to protect other persons involved or perhaps the promptings of conscience might be classed as moral coercion. After all, we must not overlook the fact that a criminal trial is a proceeding to determine the guilt or innocence of the defendant. If the jury observes his failure to testify as to facts within his apparent knowledge, it is likely to make the same deductions that it would if he failed to deny a charge made against him and in his presence out of court, since it knows of his right to testify if he chooses so to do.

"The moral coercion of the defendant, which may impel him to take the witness chair, is the consciousness that the jurors will observe his failure to do so, and, by applying their own human experience and observation, treat it as evidence of guilt. To assume that the jury will not notice that this central figure in the trial has failed to testify, but will remain in blissful ignorance of the fact until reminded of it by the prosecutor, is an assumption fully as unsound as that of the Legislature in providing by statute that 'His (the defendant's) failure to make such request (to testify) shall not create any presumption against him,' which is an amazing example of legislative confidence in its power to control human reactions.

"Neither legislative command nor judicial doctrine will close the eyes of jurors to the failure of defendant to deny from the witness chair the inculpatory facts adduced from the state's witnesses, nor can the jury fail to draw an inference therefrom unfavorable to defendant. This, the defendant well knows, and, doubting the omnipotence of the Legislature to direct the natural conclusions of men with a statute creating a negation of presumption, he is morally coerced to take the witness chair. The comment of the prosecutor does not create a situation which did not already exist and was not already evident to every juror. Hence the unreasonableness of the theory that the fear of the prosecutor's comment on the obvious fact that defendant has not testified at the trial coerces the defendant into testifying."

Such an inference is natural and irresistible. It will be drawn

by honest jurymen, and no instructions will prevent it. *Parker* v. *State*, 61 NJL 308, 39 A 651.

If the argument that allowing the inference compels the accused to take the stand and thereby give evidence against himself is carried to its logical conclusion, it necessarily follows, since the drawing of the inference by the jury is almost inevitable, that the mere grant of competency to testify contravenes the provision in our Bill of Rights against self-crimination. This means that we must return to the common law rule that the mouth of the accused is stopped, and deprive the innocent man of the right to testify in his own behalf for fear that the guilty man will be prejudiced because he dare not take the stand, and that it is unconstitutional to grant a favor lest its refusal will be prejudicial. Merely to state this argument is to show its absurdity. Since the inference will be made, whether or not comment shall be allowed is a mere matter of the degree of importance that shall be attached to it, and is within the power of the General Assembly to decide.

As well said by Chief Justice Appleton in *State* v. *Cleaves, supra,* 59 Me 298, 8 Am Rep 422:

"The statute authorizing the defendant in criminal proceedings, at his own request, to testify, was passed for the benefit of the innocent and for the protection of innocence.

"The defendant, in criminal cases is either innocent or guilty. If innocent, he has every inducement to state the facts, which would exonerate him. The truth would be his protection. There can be no reason why he should withhold it, and every reason for its utterance.

"Being guilty, if a witness, a statement of the truth would lead to his conviction, and justice would ensue. Being guilty, and denying his guilt as a witness, an additional crime would be committed, and the peril of a conviction for a new offense incurred.

"But the defendant, having the opportunity to contradict or explain the inculpative facts proved against him, may decline to avail himself of the opportunity thus afforded him by law. His declining to avail himself of the privilege of testifying is an existent and obvious fact. It is a fact patent in the case. The jury cannot avoid perceiving it. Why should they not regard it as a fact of more or less weight in determining the guilt or innocence of the accused? All the analogies of the law are in favor of their

regarding this as an evidentiary fact. All the acts of a party accused, whatever explains or throws light upon those acts, all the acts of others, relative to the crime charged, that come to his knowledge and which may influence him; his loves and his hates, his promises, his threats, the truth of his discourses, the falsehood of his apologies, pretenses, and explanations; his looks, his speech, his silence when called upon to speak; everything which tends to establish the connection between the accused and the crime with which he is charged; every circumstance preceding, accompanying, or following may become articles of circumstantial evidence of no slight importance. 'A statement is made either to a man or within his hearing, that he was concerned in the commission of a given crime to which he returns no reply; the natural inference is, that the imputation is well founded or he would have repelled it; silence is tantamount to confession.' Best on Presumptions, § 241. Extrajudicial non-responsion, when a charge is made, is always regarded as an article of circumstantial evidence, the probative effect of which may be weakened by various infirmative considerations, which it is not now necessary to discuss, but which are to be considered and weighed by the jury.

"When the prisoner is on trial, and the evidence offered by the government tends to establish his guilt, and he declines to contradict or explain the inculpatory facts which have been proved against him, is not that a fact ominous of criminality? Is his silence of any the less probative force, when thus in court called upon to contradict or explain, by the pressure of criminative facts, fully proved, than his extrajudicial silence when a charge is made to him or in his presence? The silence of the accused, the omission to explain or contradict, when the evidence tends to establish guilt, is a fact, the probative effect of which may vary according to the varying conditions of the different trials in which it may occur, which the jury must perceive, and which perceiving they can no more disregard than one can the light of the sun, when shining with full blaze on the open eye.

"It has been urged that this view of the laws places the prisoner in an embarrassed condition. Not so. The embarrassment of the prisoner, if embarrassed, is the result of his own previous misconduct, not of the law. If innocent, he will regard the privilege of testifying as a boon justly conceded. If guilty, it is op-

tional with the accused to testify or not, and he cannot complain of the election he may make. If he does not avail himself of the privilege of contradiction or explanation, it is his fault, if by his own misconduct or crime he has placed himself in such a situation that he prefers any inferences which may be drawn from his refusal to testify, to those which must be drawn from his testimony, if truly delivered."

We have frequently held that where a respondent has it peculiarly within his power to produce a witness, whose testimony would elucidate the transaction, his failure to do so is a proper matter of comment by counsel and court and consideration by the jury, and creates the presumption, or raises the inference, that the testimony if produced would be unfavorable. *State* v. *Ward,* 61 Vt 153, 191, 17 A 483; *State* v. *O'Grady,* 65 Vt 66, 69, 25 A 905; *State* v. *Fitzgerald,* 68 Vt 125, 127, 34 A 429; *State* v. *Smith,* 71 Vt 331, 334, 45 A 219; *State* v. *Parker,* 104 Vt 494, 502, 162 A 696. *State* v. *O'Grady, supra,* was a liquor case, and the court charged: "The evidence of the State is uncontradicted by any evidence introduced on the part of the respondent. The respondent has not testified. The mere fact that he has not testified is not to be taken against him. You have no right to consider that fact, but you have a right to consider the fact that the evidence introduced by the State has not been contradicted only so far as it may be contradicted in and of itself." This charge was sustained against the claim that it did not give him the full benefit of the statute allowing respondents at their own request to testify, which provides, "but the refusal of such person to testify shall not be considered by the jury as evidence against him", because it impliedly told the jury that the respondent had not called other witnesses who were present to contradict the witnesses of the State. In *State* v. *Bolton,* 92 Vt 157, 160, 102 A 489, 491, an abortion case, the court charged: "Most of the evidence introduced on the part of the State is unexplained except by the circumstances which have been called to your attention in argument, for the respondent has not seen fit to go upon the stand and testify in his own behalf. The fact that he has not testified is not to be taken against him, because he is not bound to go upon the stand as a witness and testify. He had a right to stand upon his denial and the presumption of innocence." It was held that neither the con-

stitutional nor the statutory provision was infringed by this charge.

Mr. Justice Lummus in Opinion of Justices, *supra,* states that if the constitutional provision is to be interpreted in accordance with the views of the majority of the Justices, the question may deserve consideration whether it does not preclude the drawing of an inference against a criminal defendant because of his failure to call witnesses other than himself to explain incriminating circumstances under decisions similar to those last cited. We agree. If such an inference indirectly or morally compels the accused to produce evidence to meet the testimony produced against him, we cannot see any distinction so far as the constitutional provision is concerned, whether it is evidence from himself or from others.. The answer is that the constitutional provision has only its historical meaning.

■■ No question has been raised about the nature of the comment by the State's attorney and the court upon the failure of the respondent to testify, but, owing to the erroneous view of some, who think that the grant of the right to comment upon such failure to testify contravenes the provision in the Bill of Rights against self-crimination, that it will enable the prosecuting attorney to secure a conviction without introducing sufficient evidence to make out a prima facie case, by arguing that the accused is guilty because he did not testify, it may be well to make some further observations. The inference arising from the failure of the accused to testify in his defense is no different from the inference arising from his failure to produce a witness peculiarly within his power whose testimony would shed light upon the matters in issue, or arising from the failure of a party in a civil case to testify. The inference does not amount to substantive proof of a fact necessary to the State's case, and does not arise until the State has introduced evidence of facts and circumstances, which, if believed, show beyond a reasonable doubt that the respondent is guilty of the crime charged. *Arbuckle* v. *Templeton,* 65 Vt 205, 211, 25 A 1095; *Patch Mfg. Co.* v. *Protection Lodge,* 77 Vt 294, 329, 60 A 74, 107 Am St Rep 765. But when the State has introduced evidence of such facts and circumstances which the accused could by his oath deny or explain, his failure to testify in his own behalf raises a strong inference that he cannot truthfully deny or explain them, and that if he had testified his testimony would have

been unfavorable to him. *State* v. *Kisik,* 99 NJL 385, 125 A 239; *State* v. *Smith,* 71 Vt 331, 334, 45 A 219; *Anderson* v. *Dutton,* 100 Vt 464, 467, 139 A 210; *State* v. *Parker,* 104 Vt 494, 502, 162 A 696; *Barilone Sons Construction Co.* v. *Reynolds,* 109 Vt 436, 440, 199 A 259. Such inference has a bearing upon the credit to be given to the State's witnesses. *State* v. *O'Grady,* 65 Vt 66, 69, 25 A 905.

■ Respondent's exceptions to the argument of the State's attorney and to the charge of the court are not sustained.

The respondent excepted to the overruling of his motion to set aside the verdict and for a new trial on the ground of newly discovered evidence showing certain alleged irregularities in the conduct of the investigation by the deputy fire marshal. In his brief he admits that the ruling was more or less discretionary, and simply submits "that the motion should have been granted in this case because of the importance of the question involved and because of the extremely unorthodox manner in which the evidence was attempted to be obtained." This is inadequate briefing and merits no consideration.

■ The respondent excepted to the overruling of his motion to quash the information because of certain other claimed irregularities in the conduct of the investigation by the deputy fire marshal. This motion was based upon matters not appearing upon the face of the record of the proceedings in the county court, and was therefore an inappropriate procedure. A motion to quash does not allow joinder of issues of fact depending upon the testimony of witnesses. *State* v. *Frotten,* 114 Vt 410, 411, 46 A2d 921, and cases cited. This exception avails nothing.

When this case came on for argument at the February term, 1947, the respondent filed a motion for a new trial on the ground of newly discovered evidence. This was supported by the affidavits of the respondent, his counsel, and Mrs. Bailey hereinbefore mentioned. Mrs. Bailey in her affidavit, dated August 29, 1946, takes all responsibility for the fire, and states circumstances that show that she set it and that the respondent had nothing to do with it. In his affidavit the respondent merely states that the statements contained in Mrs. Bailey's affidavit were not known to him until on or about August 29, 1946, and his counsel in his affidavit merely states that the information contained in her affidavit was not dis-

covered by him until that time. From the motion and the affidavits it appears that the respondent and Mrs. Bailey were both charged with setting the fire, and that in separate trials neither took the stand and both were found guilty. It does not appear which case was tried first.

■ Passing over the question of the propriety of the use of a motion instead of a petition and notice to the State's attorney by citation, as provided in P. L. 2107, as amended by Sec. 24 of No. 29 of the Acts of 1945, we take up the question of the sufficiency of the affidavits of the respondent and his counsel. In order for the respondent to prevail on his motion it is necessary for these affidavits to show that his situation regarding the new evidence is not due to lack of diligence on his part or on the part of his counsel. He must not only show that he did not know about it, but he must also show that his lack of knowledge was not due to negligence or lack of attention to the requirements of his case. The affidavits must state the action taken and the circumstances so that the Court can see for itself whether the required diligence was exercised. *Dunbar* v. *Farnum,* 109 Vt 313, 324, 196 A 237; *State* v. *Hathorn,* 100 Vt 431, 435, 138 A 733; *Picknell* v. *Fulton,* 89 Vt 51, 55, 94 A 104; *Ploof* v. *Putnam,* 83 Vt 494, 76 A 145. In view of the relations between the respondent and Mrs. Bailey, as shown in our statement of the tendency of the evidence, it is apparent that the affidavits are insufficient to show that the required diligence was exercised.

*Exceptions overruled and judgment affirmed. Let execution be done. Motion for new trial denied.*

MOULTON, C. J. (dissenting). The opinion of the majority holds that only physical means for compelling a person to give evidence against himself in a criminal prosecution are forbidden by Chapter I, Art. 10 of the Vermont Constitution. I am not in accord with this view.

In *Holt* v. *United States,* 218 US 245, 252-3, 31 S Ct 2, 6, 54 L ed 1021, 1030, 20 Ann Cas 1138, Mr. Justice Holmes said: "But the prohibition of compelling a man in a criminal court to be a witness against himself is a prohibition of the use of physical or moral compulsion to extort communication from him * * *". He referred, of course, to the Fifth Amendment of the Federal

Constitution, but the language therein used, "nor shall any person * * * be compelled in any Criminal Case to be a witness against himself", is the same in meaning as the corresponding phraseology of the Constitution of this State, "nor can he be compelled to give evidence against himself".

I construe this provision of our Constitution to forbid compulsion of any kind, moral as well as physical, which may cause a respondent against his will to give evidence as a witness in a prosecution against him for a criminal offense. Moral compulsion can be just as strong and just as hard to resist as physical compulsion. The statute here in question, (P. L. 2383, as amended by No. 52 of the Acts of 1935), which gives a respondent the privilege of testifying, if he so elects, and then, because he stands upon his constitutional right of silence, permits the court and prosecuting counsel to comment thereon and the jury to draw an inference adverse to him imposes upon him a moral compulsion of the most direct nature to give evidence in order to escape the consequence of a reliance upon the protection which the constitution affords him, and this is so whether he be innocent or guilty. I believe the act to be a negation of one of the safeguards provided by the fundamental law for every person who may be placed on trial for crime.

It is quite beside the point to attempt an analogy between the procedure authorized by this statute and the admissibility of testimony as to a respondent's silence when placed under arrest and before trial, or of evidence obtained by an unlawful search, or of the unfavorable inference that may be drawn where a respondent fails to produce a material witness peculiarly available to him. We are not dealing with a rule of evidence but with a Constitutional prohibition.

Nor can the statute be justified on the ground that juries observe that a respondent does not testify, and, knowing that he has the right to do so if he wishes, inevitably infer that he cannot truthfully deny or explain the evidence against him. This argument does not appeal to me. It amounts to saying that because juries do not respect a respondent's constitutional rights such lack of respect might as well receive legislative blessing. Furthermore I do not accept the premise. Before its amendment P. L. 2383 required that juries be instructed that the refusal of a respondent

to testify must not be considered by them as evidence against him. It cannot be assumed that this admonition was not given due weight and attention by those to whom it was addressed.

I am of opinion that the judgment of the trial court should be reversed.

JEFFORDS, J. (dissenting). I concur in the dissenting opinion of the Chief Justice but as I have additional reasons for dissenting I shall state them as briefly as possible.

I cannot agree with the holding of the majority that No. 52 of the Acts of 1935 is constitutional. By article 10 of chapter 1 of our constitution it is provided that in criminal cases a person cannot be compelled to give evidence against himself, or, in other words, that a respondent cannot be compelled to take the witness stand. The right thus given is absolute and unconditional. A respondent is entitled to the full protection given him by this constitutional provision. If the jury may be instructed by the court that they may draw inferences from the failure of a respondent to take the stand and, especially, if the prosecuting attorney may comment to the jury on such failure, then the right and protection guaranteed by the constitution is broken down if not completely nullified. The constitutional right is so shorn and stripped by the statute that what is left is a mere naked right of no particular value.

The majority adopt the reasoning in the dissenting opinions in *State* v. *Wolfe,* 64 SD 178, 266 NW 116, 104 ALR 464, and *Opinion of the Justices,* 300 Mass 620, 15 NE2d 662, which held that statutes similar to No. 52 of the Acts of 1935 were in violation of constitutional provisions like article 10 of chapter 2 of our constitution. In support of this dissent I rely on the opinions of the majority in those cases. Our own Court in *State* v. *Cameron,* 40 Vt 555, 565, indicated it considered that a statute such as the one in question would be unconstitutional. True it is, as stated by the majority, that the statement in the opinion in the case to the effect that our constitution forbids a prosecuting attorney to argue that the failure of a respondent to testify is evidence against him was dictum as far as the constitution is concerned but at least it shows how our Court, as then constituted, felt about the question here under consideration. In Connecticut, as stated by the ma-

jority, it is held that the drawing by the jury of unfavorable inferences from the neglect or refusal of a respondent to testify does not violate its constitutional provision against self-crimination. In that state prior to 1879 it was provided by statute that such neglect should not be commented on by the prosecuting attorney or by the court. This statute was changed so as to repeal the prohibition against comment by the court, leaving in effect the prohibition against comment by counsel to the court or jury. In *State* v. *Heno,* 119 Conn 29, 174 A 181, 94 ALR 696, the court in the course of its opinion holding that under the cases in that state and the statute in its changed form, the Court has the right of comment says, in respect to the statute as then worded, "The evil which the statute is designed to prevent is the placing, in the argument of the state, of undue and unfair emphasis upon the failure of an accused to testify". Thus, it seems to me, the Connecticut court has recognized impliedly, at least, that to give the right of comment to the prosecution attorney would be unconstitutional. Also in support of my position see Wigmore on Evidence, 3rd ed. Secs. 2272, 2272a and 2273.

The majority quote from and rely heavily on the historical background of constitutional provisions similar to ours as set forth by various judges and authors. Whatever may have been the historical reasons for the granting of this constitutional protection, the fact is that it is granted in positive and unequivocal terms. There is nothing in the wording of article 10 which indicates an intention to grant less than the full right therein set forth. It must be presumed that the dissenting opinions of the various justices in the South Dakota and Massachusetts cases, *supra,* setting forth the historical reasons relied upon by the majority in the case at bar were fully considered by the other justices sitting in those cases and rejected by the majority in each case as valid reasons for holding the acts in question constitutional.

It seems to me so obvious that the constitutional right of a respondent is invaded by a statute permitting comment to be made and inferences to be drawn from his failure to testify that nothing more need be said in support of this patent fact. However, in support of my position and in answer to some of the reasons given by the majority in support of their holding I shall discuss the matter further.

The position of the majority in regard to inferences seems to be that they will be drawn in any event by the jury so it cannot reasonably be said that the constitutional provision was aimed against them and that no statute directing that they should not be drawn is of any avail. My answer is that our statute of 1866, set forth in the majority opinion, and similar statutes in other states providing that the refusal of a person to testify should not be considered by the jury as evidence against him, supplemented the various constitutional provisions granting the right to refuse to take the witness stand. These statutes recognized the right that was so granted and took means to fully preserve it. If jurors deliberately disobeyed the instructions of the court, that has no bearing on the question before us. The full right of constitutional protection existed and it could not lawfully be taken away by the wrongful action of a jury.

It is admitted by the majority that the statute in question may place a respondent in a dilemma. Of course this is so. In *State v. Wolfe, supra,* the majority stated that the right of comment would compel every defendant in a criminal case to take the witness stand and testify and thereby subject his whole life's record to the most relentless cross-examination, or face the alternative of having the prosecutor, in the most violent manner, parade before the jury the claimed fact that the defendant is guilty because he chose to stand upon his constitutional rights.

The majority here take the position that if one is innocent he has nothing to fear in taking the stand. In *State v. Cleaves* from Maine, quoted from extensively in the majority opinion, it is said that the embarrassment of the prisoner, if embarrassed, is the result of his own previous misconduct, not of the law. I do not agree with either the position taken by the majority or the statement in the Cleaves case. In this latter case it is assumed that every respondent who is embarrassed by the predicament in which he is placed by the right of the jury to draw inferences against him if he fails to take the stand is a guilty person. This is not at all necessarily so. An innocent person may well be so embarrassed. He may be innocent of the crime charged but have a criminal record which will be paraded before the jury if he takes the stand. He may be innocent but easily confused by cross-examination and made thereby to appear guilty. His looks or personality

may indicate guilt though he be innocent. Other examples might be given to illustrate that the innocent as well as the guilty are affected adversely by the statute in question to the derogation of their constitutional rights.

The majority contend that the permission to comment and draw inferences no more compels a respondent to take the stand than do all the mechanics of a criminal trial which are a form of moral coercion. They say that if this permission is in violation of the constitutional rights of a respondent then the right to draw an inference against an accused because of his failure to call witnesses to deny or explain unfavorable testimony is also unconstitutional. To my mind these claimed analogies are not in point. The right granted by the constitution to a respondent to refuse to take the stand is one personal to him. This constitutional protection does not otherwise affect the mechanics of a criminal trial nor does it apply to the rule as to inferences from a failure to produce evidence. Wigmore, *supra,* Sec. 2273.

If the right to draw inferences from and to comment on the failure of a respondent to take the stand should, as a matter of public policy be granted, it must be conferred by constitutional amendment, and not by legislation. The constitutions of Ohio and California have been amended apparently for this purpose.

For the reason that I believe No. 52 of the Acts of 1935, which amended P. L. 2383, is unconstitutional, and for none other, I should reverse the judgment and order a new trial.

### Upon Motion for Reargument.

SHERBURNE, J. After the opinion had been handed down the respondent moved for a reargument on account of two statements in the opinion which he claimed to be inaccurate and not to state the law correctly.

He claims that the statement, "Nothing in the Federal Constitution applies," overlooks the Fourteenth Amendment to the Federal Constitution. The opinion cites *Twining* v. *New Jersey*, 211 US 78, 29 S Ct 14, 53 L ed 97, in support of this statement. That is the final authority upon this question, and directly supports the statement.

He calls attention to the statement

"Even in the case of a respondent with mental or language deficiencies, or with a prior criminal record which may affect his credibility as a witness, if his counsel will bare these in his direct examination, rather than wait to have them shown upon cross-examination, the jury will give him fair consideration if his testimony rings true."

and suggests that it cannot be reconciled with the rule that a party cannot impeach his own witness. There is no difficulty here. We have long recognized that questions to a witness directed toward aiding the jury in setting a proper estimate on his testimony are preliminary in their nature and may properly be asked in direct examination, as, for example, questions which relate to the age of the witness, his residence, his occupation, and his condition in life. 70 CJ 555. Questions relative to the matters mentioned in the quoted statement come under this rule also.

*Motion for Reargument denied.*