350

THE PEOPLE, Plaintiff and Respondent, v. ARNOLD McCLELLAN et al., Defendants and Appellants.

Roger S. Hanson, under appointment by the Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Philip C. Griffin, Deputy Attorney General, for Plaintiff and Respondent.

FOURT, J.—This is an appeal by each of the appellants from convictions of murder in the first degree.

In an information filed in Los Angeles on August 31, 1962, Arnold McClellan, Willie Ford and Henry Peter Bumpers were charged with murdering Joseph Palmer on July 6, 1962. Ford was charged with a prior robbery conviction in Los Angeles on December 11, 1959, and McClellan was charged with a prior burglary conviction in Los Angeles on January 10, 1956. In a trial by jury each of the defendants was represented by separate counsel. Bumpers was found guilty of

murder in the second degree and is not involved in this appeal. McClellan was found guilty of murder in the first degree and the penalty was fixed at life imprisonment. He admitted the charged prior conviction. Ford also was found guilty of murder in the first degree and the penalty was fixed at life imprisonment. The charged prior conviction of robbery was admitted.

Each of the defendants thereafter appealed and this court in an opinion filed December 17, 1965, affirmed the judgments of conviction. A hearing before the Supreme Court of California was denied. McClellan and Ford petitioned the Supreme Court of the United States for certiorari and that court on March 13, 1967, vacated the judgments and remanded the case "for further consideration in light of *Chapman* v. *California*, 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]." The order further stated, "Mr. Justice Stewart would grant certiorari and reverse the judgment for the reasons stated in his concurring opinion in *Chapman* v. *California*, 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]." This court pursuant to the mandate of the Supreme Court of the United States recalled the remittitur as to McClellan and as to Ford, vacated the judgments and reinstated the appeal "in light of *Chapman* v. *United States*, 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]."

The basic facts and other information are as related in the previous opinion and stated as follows:

"On July 6, 1962, around 3:20 p.m., as was his weekly custom, Joseph Palmer, owner of Mutual Liquors, went to the bank and obtained cash—$1,692.60 in currency and coin—which he placed in a paper bag. Between 3:40 and 4 p.m., Milton Howard, a barber, who was waiting to cross the street, saw Palmer park his car on the south side of 51st Street. As Howard crossed the street he called to Palmer; at that time he saw a man whom he later positively identified as McClellan, wearing blue pants and a red shirt, standing against a wood fence approximately five feet from Palmer. (Ten or eleven days before Howard had seen McClellan, Bumpers and Ford in the vicinity; Bumpers came into his barbershop for a light and the three walked toward Mutual Liquors.) Howard mailed a letter, turned and saw McClellan walk up to Palmer and bump into him; he then heard a gun fire and saw smoke and McClellan grab a paper bag in Palmer's hand and run up the alley. Palmer fell; Howard hailed a passing police car and when he turned to Palmer the latter expired. The foregoing

was also observed by James Quinton, 17, who had been washing his car on the south side of 51st Street. He saw the man whom he also later identified as McClellan, wearing a red shirt and levis, leaning against a fence on the north side of 51st Street for about twenty minutes. He also saw Palmer park his car, gather his money and leave for his store, at which time McClellan walked across the street and approached Palmer. McClellan held a gun and a shot was fired; he took the money and ran up the alley.

"Officers found Palmer lying on the sidewalk; he appeared to be dead. They talked to Howard and Quinton. Shortly thereafter Sergeant Appleton arrived and started a police investigation.

"The next day, July 7, an autopsy examination of Palmer showed that his death occurred within a matter of minutes and was caused by a gunshot wound in the chest, and that the gun was no more than inches away when fired. Sergeant Wolfer, a ballistic expert, compared the bullet (Exh. 10) recovered from the body with a bullet test fired from a Walther automatic (Exh. 12), later recovered by Ford, and formed the opinion that both bullets were fired by that gun.

"The following was received out of the presence of the jury: On July 22, 1962, one James Carter told Sergeant Appelton that Ford had been involved in the robbery with two others, had been a 'lookout' and furnished the gun; that Bumpers owned and had driven the car, and ' "Sonnie" ' McClellan was the actual triggerman; that the three returned to Ford's house and divided the loot; that he [Carter] had taken Bumpers to the scene of the murder where he saw officers standing around a body, at which time Bumpers said, 'I was the driver on that robbery'; that the car was a 1962 Chevrolet. Sergeant Appleton verified the story by showing Carter police photographs of Ford and Bumpers, whom he identified. Appleton then checked police records and discovered that Ford had a previous robbery conviction, which case he had handled; and from his criminal package he found numerous addresses for Ford.

"After several days of checking addresses, Sergeants Appleton and Beeson went to a rooming house on 61st Street, around 3:45 p.m. on July 31, 1962. A woman resident admitted them to the house and led them to a room; approaching it she yelled, 'Willie, some one here to see you'; Ford came out. Appleton said, 'Hello, Willie, how are you?'; he said, 'Fine.' Appleton said, 'I would like to talk to you'; Ford asked,

'What about?' Appleton replied, 'The incident at—or the occurrence at 51st and Main Street'; Ford said, 'Well, let's step in my room and talk about it.' Then Appleton said, 'You are under arrest, Willie,' and handcuffed him. They entered the room and Sergeant Beeson asked Ford if he wanted to tell them about the occurrence on July 6. Ford's statements were freely and voluntarily given. Ford said, 'I don't know what you are talking about. Tell me a little bit more about it.' Appelton said, 'All right, we are talking about the robbery and the shooting that occurred on July 6 at 51st and Main Street where the man was shot returning from the bank. That you, Willie Ford, were the lookout. Henry Bumpers was the driver of the get-away car and another guy was the actual triggerman. That you and the other two men split the loot. That you weren't actually at the scene of the robbery, but you were a short distance from there and that you have the gun.' Ford then said: 'Okay. I will tell you about it. Actually, I wasn't in on it. I was—I knew about it, but I wasn't at the scene of the robbery. A guy by the name of Sonny was the guy that actually took the money and Bumpers drove his car and I waited on the street while it happened and then we left in Bumpers' car and came back to my place.' He also said he had gotten $325, Bumpers had gotten $500 and Sonny, the rest.

  ''Appleton asked him if he knew the whereabouts of the gun; Ford replied, no, that Bumpers had it; Appleton said, 'Look, Willie, I know you have got the gun. Now, let's come up with it.' Ford replied, 'Well, I don't really have it. I gave it to a friend of mine to keep,' that it was over on the west side. Appelton said, 'Let's go get the gun'; Ford said, 'All right.' Ford made a phone call to locate the exact address; then he directed the officers to a duplex on 48th Street, pointed out a Pontiac parked in front and said, 'That is Sam's car. If Sam's car is here, Sam is home. He generally is, when the car is here.' The officers received no response to their loud knock on the front door. The landlady tried to get in touch with her lawyer but was unsuccessful, then declined to give them the key, but upon being asked if she knew whether the occupant was home, she said, 'I don't know, but his car is out front and when his car is here, he is usually here.' They knocked again believing Sam was inside. They did not intend to arrest him but they were told by Ford that the gun had not been altered after the robbery, and believed it

was still a loaded gun. Receiving no response to further knocks, the officers forced their way in taking Ford with them. In a bureau drawer a gun (Exh. 12) was found; Appleton asked Ford if it was the one used in the robbery; he replied, 'That looks like it.' The gun had a clip of live rounds (Exh. 13) in it. The officers had no search warrant.

"They took Ford to the station, and an hour later, about 5 p.m., in the interview room, Sergeant Appleton had a taped, ten minute conversation with him; all of Ford's statements were freely and voluntarily given. Ford said that the robbery had been mentioned among the fellows sometime before July 6; early on that day Bumpers said, 'Well, what do you think'; McClellan said, 'Well, we git [sic] it'; he [Ford] said, 'Well it's up to you people. I am not going to be really involved in it. I'll sit in the car. That's all I'm going to do'; they were in Bumpers' light blue 1962 Chevrolet; they went to McClellan's apartment and McClellan said, 'I'm going to get the money today,' that he was going to go by the place on 51st and Main and snatch the money; Bumpers said he had a weapon and would let McClellan have it; he [Ford] did not see it before and during the robbery; he had gotten out of the car and the next thing he saw was McClellan running, saying, 'Let's go'; it was generally known in the neighborhood that Palmer had a great deal of money on the weekends; Bumpers had driven the car and parked it on 52nd Street; he [Ford] got out of the car after McClellan, who wore blue jeans and a red sweater, had taken his position on the corner; McClellan returned to the car and Bumpers drove to his [Ford's] house where they divided the money which was in a paper bag; the others left the gun at his house so he told a friend to take it away; he didn't want to be in on it if a gun was to be used in the robbery, but the other two did; he did not know of the shooting, for McClellan had said, 'I had to hit him on the side of the head.'

"McClellan was arrested around 5 p.m. that evening (July 31); Ford identified McClellan through a one-way mirror as the man who committed the robbery. Shortly thereafter, Sergeant Appleton had a conversation with McClellan; the next afternoon (August 1) they had a second conversation which was taped and monitored by Sergeant Sonlitner. Both conversations were similar in substance, and freely and voluntarily given. McClellan said he knew Ford; he denied knowing Bumpers but when shown his picture, acknowledged that he had been introduced to him by Ford on July 6; he was wear-

ing khaki trousers and a red shirt; he remembered the date because he had bought an automobile that day after leaving the other two men and borrowing $190 from Al Lamb; he used the borrowed money, and his own and his wife's money to buy the car. During both conversations he denied his guilt. In McClellan's effects police found an order for the purchase of an automobile (Exh. 17), an invoice (Exh. 17-A), and a receipt (Exh. 17-B).

"The next morning (August 2) around 10 a.m., Sergeant Appleton received a telephone call as follows: 'This is Henry Bumpers. I understand you want to talk to me'; the sergeant: 'Yes. Do you know what we want to talk to you about?'; Bumpers: 'I understand I am wanted for murder back there'; the sergeant: 'Well, where are you?'; Bumpers: 'In Mobile, Alabama'; the sergeant asked him if he knew that they wanted to talk to him about the incident at 51st and Main; he replied, 'Yes'; the sergeant asked him if he was involved; Bumpers replied, 'No'; when asked if he was driving, Bumpers said either, 'My car was involved, but I wasn't driving,' or 'I was involved, but my car wasn't'; then he said he would give himself up.

"On August 7, Bumpers voluntarily surrendered with Mr. Beckler, an attorney. On August 15, around 11:38 a.m., Sergeant Sonlitner went to the Hall of Justice in response to a request made by Bumpers to make a statement; he told Bumpers that the jailer had said that he wanted to make a statement; Bumpers said, 'Yes.' Thereupon, he took Bumpers to the Homicide Division. He asked him why he wanted to make a statement when at the time he surrendered he had told him that his counsel had advised him not to make any statement; Bumpers replied that he had discharged Beckler and he was looking out for himself from now on. The sergeant asked him to make a written statement for accuracy's sake. Bumpers then proceeded to write out a five-page statement.[1]

---

"[1] 'Hall of Justice, Room 317, August the 15th, 1962, about 11:40 A.M. On July 6, 1962, the morning about 9 o'clock, I was up on 61st and Main Street waiting for the bookie to come (Jene). Willie Ford approached me and asked me if I wanted some money. I said, "Yes," or if I had any. He asked me if I would jerk some money. I told him no. He left and came back and asked me if he could use my car. I asked him for what. He said, "That is all right——" I said, "No." Then he came where I was, 103rd, and asked me if I wanted to make $500. I told him, "Yes." He didn't tell me how. We left and went to 54th and Compton to Sonny's house. Willie went in the house and talked to Sonny. I went into the yard and met some kids and talked with them.

Sergeant Sonlitner read the statement back to him and went over it with him in detail. On August 16, after Bumpers had been arraigned, Sergeant Appleton talked to him. His statements were freely and voluntarily given. Bumpers verified the truth of the statements he had made in his written statement. The sergeant asked him to repeat them; for the most part his

---

We left and stopped on 54th and Central. Willie Ford went in and got a bag containing the gun from a man about two hundred and some pounds; about six feet or more tall. He drives a red pickup truck. That is—the bag, I thought—had (dope or narcotics.) Before then he went around the corner. I didn't see where, but he said he was waiting on this man in the red truck for a deal. I don't know what kind. When we got ready to leave I thought Ford had narcotics. I told him to drive. We went on 57th off of Vermont to Henry Rovive's house. Mattic was there, Edmana or Remona and her son were there. We left there and he put me out on 61st and Main at the cafe. When he and Sonny got back, I asked him if he had got my money. He said, no. I took my car. He and I went on 42nd and Broadway to a cafe. I put him out on 61st and Main and went to 103rd and Main to Leon's place and won some money. Ford came and asked to use my car. That he had a $12,000 deal he was going to give me $500, so I let him use my car about 2:30 or 3:00 o'clock or maybe later. When he got the car I rode with him to 61st and Main. I don't know how he got to 103rd. I waited there at 61st. When he got back, Sonny was at Ford's house, Ford came to the corner by the cafe. I asked him if he got the money. He said, yes. Sonny had the gun. When I got into Ford's house, I heard him say, "I shot the man. I hit him. I think I shot him." That is the first I knew it was a shooting or a robbery. Sonny gave the gun to Ford. Sonny gave Ford $350 and told me to hush. I was afraid. I went down to Leon's and started gambling and won some money. (Jimmie) Carter, James, came in, asked me if I was going to pay on my car. I told him, yes. We went to Fletcher Jones. I told them I wanted to pay them. They told me I lied about my license (driver's) so he didn't accept the money. I left the car. Then, I got nervous and told James Carter to notify the police. I was afraid to. He said he might get involved. Later, close to the 17th, my uncle died in Alabama, Jackson, Route 1, Tommy Bumpers my wife's daddy live in Mobile, Ala. My sister sent me money to come home on. I told James Carter I was going home to meet my wife coming from Chicago and I told him to notify the police. He put me out on 76th Street about four. That's the last I saw him. The night after the robbery I was gambling at Earlines and I lost some money. Jene told me I should send my wife some money, so I sent her $150. I had been instructed not to say anything about the case. I asked Dennis' lawyer what would he do. He told me to get the hell out after I was going to the funeral. I told James Carter to notify the police but he lied about some things. When I got to Mobile, a friend called me and told me I was wanted for murder. I called the University Detectives and talked to Mr. Appleton. He told me to give up in Mobile. The extradition papers would be ready and they would fly me back. I told him I would give up Monday or Tuesday in Mobile but it's prejudiced in Alabama so I didn't want to be involved with the police there. I came back to L.A. Sunday, the day before I went in to see the detectives—at the University Detectives on Santa Barbara, me and Lawyer Beckler. When I talked to Mr. Appleton on the phone he said, he knew I was driving the car in the robbery. I told him I wasn't driving but my car was involved. Henry Bumpers. I was not promised any favors or was beaten. I was free and voluntary. Henry Bumpers.'

statements paralleled those in his written statement, but there were several inconsistencies.[2]

"On June 30, Bumpers went to Fletcher Jones Chevrolet with James Carter to buy a new car; he had no money so, toward the $500 downpayment, Carter loaned Bumpers $400 by way of his [Carter's] personal check for $400, which Bumpers endorsed and gave to the salesman; the $100 balance was due July 13, 1962. Bumpers gave the salesman certain information (re employment and his address) on a credit application; he drove a 1962 Chevrolet away. On July 2 the dealer found Carter's check was not good and Bumpers' credit information to be false, and finally contacted Carter. Between 1 and 2 p.m. on July 6, 1962, Carter returned with Bumpers, at which time the dealer cancelled the transaction and demanded return of the car by 6 p.m.; Bumpers offered to pay cash for Carter's check but the dealer refused. Between 5 and 6 p.m. Bumpers brought back the car; Carter was given his check and Bumpers again offered to pay cash, but the agency refused to accept it.

"On July 1, Albert Lamb loaned McClellan $200; McClellan told him he was going to get a car and when he went to work he would pay the loan; he got a receipt for the money but did not date it until July 7, 1962.

"Around 5:30 p.m. on July 6, 1962, McClellan and a woman bought a 1953 Cadillac from Louis Szally for $314

---

[2]He said that on the morning of July 6, 1962, he was across the street from Willie Ford's place at 61st and Main. Willie asked him if he wanted to make some money. When he said, 'yes,' and asked how, Willie said it would be taken in a money snatch. Appellant Bumpers said he didn't want to be involved in anything like that. On Willie Fords' request he drove to 54th and Hooper where he met Sonny. They drove to 54th and Central where Willie got out and talked to a man, went around a corner and came back with a paper bag. Appellant Bumpers told appellant Ford to drive because he didn't want to be involved with anything that was in the bag as it might be dope. Then they dropped off Sonny and they went to 103rd and Main to a gambling joint. Later that day appellant Ford asked him again if he wanted to make $500 and explained that it was a $12,000 or $15,000 money snatch. Appellant Bumpers said that he didn't want to get involved, but, 'You could use my car.' They then went to 61st and Main where appellant Ford was joined by appellant McClellan. They drove off in his car. After a period of time, they came back in his car. The three of them went into appellant Ford's house where appellant Bumpers observed appellant Ford give appellant McClellan a portion of the money in a paper bag. He asked appellant Ford for his cut and appellant Ford told him to hush up and they left. Appellant Ford had never given him any money and did not receive any money for his cut. Later that night, he had heard that man had been shot or killed during the holdup. He asked James Carter to go to the police and tell them what had happened so he could give himself up, but he went to Alabama for a relative's death."

cash; the woman paid the amount in cash in various denominations.

"Each of the defendants declined to testify. McClellan offered alibi evidence through the testimony of three witnesses."

The appellants in the first appeal argued that their motion to sever their trials was improperly denied, that there was a prejudicial violation of appellants' right to counsel in the taking and admission of statements, that there was an unreasonable search and seizure, that the argument of the district attorney and the instructions of the court with reference to appellants' failure to testify resulted in a miscarriage of justice, and that evidence of a very recent purchase of a new car was improperly admitted.

For all intents and purposes the same contentions are made in the present appeal. We deem it sufficient to consider the one facet of the case which is indicated and stated in the orders to this court by the Supreme Court of the United States.

It must be remembered in fairness to the prosecutor in this case that at the time of the argument to the jury, (March 26, 27, 1963, April 1, 1963, on the guilt phase of the case and April 10, 1963, with reference to penalty) it was perfectly proper, constitutional and customary for a prosecutor to argue or comment on the failure of a defendant to take the stand to testify in his own defense. The argument of the prosecutor contained many references to the failure of defendants to testify.[1]

---

[1] ". . . even though the defendants didn't testify, . . . ."
"I submit to you, ladies and gentlemen, as I will get to the point *about the defendants later [failure] to testify* that in light of the Defendant Bumpers and McClellan's failure to testify to that incident, that establishes Mr. Howard's veracity because his Honor will tell you that a witness is presumed to speak the truth and this presumption applies to prosecution witnesses, to defense witnesses."
". . . Now, this is important, because his Honor will tell you that when a defendant is questioned and gives a false statement, that that statement may be used as a consciousness of guilt and *Mr. Ford has not taken this witness stand to deny that he told Sergeant Appleton that Bumpers had the gun.*"
" 'Q How do you know the gun came from there?'
"Now, this is a very important question. *Had Mr. Ford taken the stand, this is one of the questions I would have asked Mr. Ford, 'How did you know where the gun came from?'* "
"*Bear in mind that Mr. Ford at no time testified* that they were coerced, at no time did Mr. Ford testify that they were involuntary."
"Now, we have recited the testimony of Officer Appleton as pertaining to Mr. Ford's statement.
"*Bear in mind that Mr. Ford did not testify.*
"Bear in mind that any of the statements that Mr. Appleton testified to and were played to you by the recording *were not Mr. Ford testifying*

Footnote 1—Continued

*under oath,* and his Honor will instruct you pertaining to the question as to whether or not a defendant in a criminal trial must testify, and he will tell you in substance that it is a constitutional right of a defendant not to testify and any shortage of proof of the prosecution's case cannot be supplied by the defendant not testifying.

"*However, if the evidence in the case is such as to draw an unfavorable inference to the defendant and he has knowledge of that evidence and fails to deny or explain that evidence you may look unfavorably at the defendant's point of view or draw an unfavorable inference from his lack of testifying.*

"Now, what does this mean?

"Mr. Ford admitted to the officers that there was a concert of action.

"Mr. Ford admitted to the officers that there was a discussion both on the day of the robbery and a day previous to the robbery, that there was going to be a taking of this man's money on the way back from the bank.

"Mr. Ford admitted to the officers that they had discussed the use of a gun and Mr. Ford admitted to the officers that he got $325 for his part in it.

"Now, you say, 'Oh, wait a minute. Where did he say that he got $325 for his part in it? What did he do for that?'

"I submit to you, ladies and gentlemen, Mr. Ford no matter who the other two men were now, forget a moment who the other two men were, Mr. Ford wasn't given that $325 gratuitously.

"He had to earn that.

"Now, how did he earn that money? And this is *one of the reasons why I say when a defendant fails to testify and there are facts within his knowledge that he could explain, you could draw an unfavorable inference,* that he got that $325, No. 1, as acting as a lookout.

"No. 2, to get rid of the gun.

"No. 3, for the information that he supplied that Mr. Palmer carried his money from the bank to the liquor store on Friday afternoons at this time.

"Mr. Ford aided, abetted, and encouraged and advised. He is a principal under the law for his participation or else Mr. Ford, why did you get that $325.

"He certainly wouldn't have admitted getting the $325 if that wasn't so.

"He certainly wouldn't have admitted to the officers that they had a discussion about this taking the money from the man on the way from the bank if that wasn't so.

"He certainly wouldn't have admitted that he got out of the car and went down the street if that wasn't so. He was acting as lookout.

"He got rid of the gun for them and he supplied them with the information. This is the fair inference of the People's case as pertains to Willie Ford and it is upon this evidence which we ask you to convict Willie Ford of first degree murder.''

"Now, ladies and gentlemen, *you will be instructed in accordance with the defendant's failure to testimony that if a defendant can reasonably be expected to deny or explain certain facts and he fails to do so, you can draw an adverse inference from that failure to do so.*"

". . . *When the defendant fails to explain a fact that is reasonably within his knowledge, you can draw an adverse inference from that fact.*"

"Mr. Bumpers, how much money did you win? It was within his knowledge to explain these facts. *He doesn't explain these facts. What inference can we draw?*"

"And I submit to you, ladies and gentlemen, that that is the thing that shows beyond a reasonable doubt; Bumpers' own statement to the officer; Bumpers has not denied that testimony and again, *going back to the defendant's failure to deny, failure to testify, that you can draw those inferences adverse to the defendant.*"

The judge instructed the jury (CALJIC No. 51 Revised) on the subject matter.[2]

---

"As to any evidence or facts against Mr. Bumpers, which the defendant can reasonably be expected to deny or explain, because of facts within his knowledge, *if he does not testify, you, the trier of the fact may take that failure into consideration as tending to indicate the truth of such evidence and as indicating that among the inferences that may be reasonably drawn therefrom, those unfavorable to the defendant are more probable.* Did he leave town because his uncle died in Alabama, or did he leave town as an indication of flight, because as you know, ladies and gentlemen, there's an old saying that the wicked fleeth when no man pursueth."

"That testimony stands unrefuted by Mr. Bumpers, and with respect to that testimony, *the failure of the defendant to testify on that issue, you can draw an inference adverse to the defendant.*"

"I say to you, ladies and gentlemen, that the facts in the case; taking all of them into consideration, disseminating them, using your ordinary logic, Mr. Bumpers knew that when he was offered $500, that this was not a legal transaction. He asked how? He was told to take the money from a man on the street. Although he has a criminal mind, he is still deemed in law to be responsible for his actions and he knows that a man on the street is not going to give up money. Remember, Mr. Bumpers' statement was that Ford said about $12,000. $12,000 without a fight? He knew right then and there that he was engaging in an illegal enterprise and *the fact that he has not denied that from this witness stand reaffirms that position.*"

"Ladies and gentlemen of the jury, I say this to you. Now, the *best evidence of alibi is the defendant himself telling you where he was.* The defendant himself knows far better than anyone where he was and the fact that *he failed to deny, that is a matter within his knowledge.* This is not a case of where he is picked up a year later and he says, 'Well, gee, I just can't remember where I was.' This is a case where he was arrested three weeks later. He was questioned. He had this document in his pocket. He was questioned about a specific date. Told the officers about meeting Bumpers that day. His failure to deny the facts that are within his knowledge, you may use to draw an unfavorable inference. Remember that when his Honor gives you that instruction because certainly this is evidence that was within his knowledge, where he was on that day."

"I wish—*I just wish that Mr. Bumpers had taken the witness stand and testified to counsel's statement.*"

"Counsel says to you 'What is he going to testify to?'

"You will recall his comment, page 1690, says, 'Now, then, *there was a big fuss made about the defendant not testifying.* What am I going to have Willie Ford testify to? That he made the statement question mark. We don't deny that he made it. You heard it. Do you want to hear it again? For a number of reasons I hope you will listen to it a few times.'

"Notice that counsel's words are: 'What am I going to have Willie Ford testify to?'

"Have him testify to the truth. Have him testify to the truth. Have him cross-examined, *and bear in mind the Court's instruction on a defendant's failure to testify.* It doesn't supply the missing link in the People's case, true.

"But the defendant has knowledge within himself as to what he was going to be the lookout for.

"Is this a proper question to put to him?" (Italics added.)

[2] "It is a constitutional right of a defendant in a criminal trial that he may not be compelled to testify. Thus, whether or not he does testify rests entirely in his own decision. As to any evidence or facts against

The prosecutor was arguing the law of the day at the time and was taking full advantage of that which was available to him by way of argument. His argument was common sense and in conformity with the wishes of the people of California as expressed overwhelmingly when they voted in the constitutional amendment, article I, section 13, California Constitution.

By *Griffin* v. *California*, 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229], decided April 28, 1965, the court held that the self-incrimination guaranty of the Fifth Amendment, in its bearing on the states by reason of the Fourteenth Amendment, forbids either comment by the prosecution on an accused's silence or instructions by the court that such silence is evidence of guilt.

In *Chapman* v. *California*, 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824], decided February 20, 1967, the court held that federal law was applicable in fashioning a rule as to what constituted harmless error in the case, that before an error involving the denial of a federal constitutional right can be held harmless in a state criminal case, the reviewing court must be satisfied beyond a reasonable doubt that the error did not contribute to a defendant's conviction and that under such a rule the continuous and repeated references in the case to the defendants' failure to testify and to the inferences which could be drawn therefrom did not constitute harmless error.

Many distinguished scholars have stated, in effect, that there is nothing in the history of the privilege against compulsory self-incrimination which even suggests a preclusion

---

him which the defendant can reasonably be expected to deny or explain because of facts within his knowledge, if he does not testify or if, though he does testify, he fails to deny or explain such evidence, the jury may take that failure into consideration as tending to indicate the truth of such evidence and as indicating that among the inferences that may be reasonably drawn therefrom those unfavorable to the defendant are the more probable. In this connection, however, it should be noted that if a defendant does not have the knowledge that he would need to deny or to explain any certain evidence against him, it would be unreasonable to draw an inference unfavorable to him because of his failure to deny or to explain such evidence. The failure of a defendant to deny or explain evidence against him does not create a presumption of guilt or by itself warrant an inference of guilt, nor does it relieve the prosecution of its burden of proving every essential element of the crime and the guilt of the defendant beyond a reasonable doubt.

''In deciding whether or not to testify, the defendant may choose to rely on the state of the evidence, and upon the failure, if any, of the People to prove every essential element of the charge against him, and no lack of testimony on defendant's part will supply a failure of proof by the People so as to support by itself a finding against him on any such essential element.'' CALJIC Inst. 51 as revised.

against such comments by the prosecutor as are under examination in this case. (See *The Right to Comment on the Failure of the Defendant to Testify* by Professor Andrew Bruce, former Chief Justice of the Supreme Court of North Dakota, 31 Mich. L.Rev. 226; 8 Wigmore, Evidence (McNaughten Rev. 1961) §§ 2250-2252, pp. 267 to 318; McCormick, Evidence, pp. 279-280; *State* v. *Baker,* 115 Vt. 94 [53 A.2d 53, 57-60].)

It is further true that when the state points an accusing finger directly at a defendant, common sense demands that he testify, if in truth he is able to fend off the evidence against him and neither the absence of comment nor an instruction against an adverse inference can dilute the inculpatory force of uncontradicted evidence of that character. (*State* v. *Garvin,* 44 N.J. 268 [208 A.2d 402].)

A criminal trial ought to be a proceeding to ascertain and determine the guilt or innocence of a defendant.

The appellants in this case as of the time of the trial received a fair and proper trial and were legally convicted and sentenced to the state prison for killing their victim in an armed robbery.

The Fifth Amendment was never designed or enacted, nor has it been interpreted until recently, to be a device to shore up the excessively timid and nervous criminal defendant. It was enacted to protect against and prevent the use of compelled testimony and statements.

In any event, however, under the directive under which we are now acting, we are not persuaded that we can hold to the effect that there is no reasonable possibility that the references by the prosecutor to the defendants' not testifying in their own behalf, under the circumstances, contributed to the convictions. Such being the case we are in effect under the directions of the United States Supreme Court to reverse the judgments. In other words, the judgments against McClellan and Ford, two murderers, must now be reversed because the Supreme Court changed the rules after the case was tried.

The judgment as to McClellan is reversed and he is remanded for a new trial.

The judgment as to Ford is reversed and he is remanded for a new trial.

Wood, P. J., and Lillie, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied February 14, 1968.