### State of Vermont v. Shawn Ely
### (Wanda Allard, Appellant)

[708 A.2d 1332]

No. 96-587

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed December 19, 1997

---

*Jeffrey L. Amestoy,* Attorney General, and *Susan R. Harritt,* Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Robert Appel,* Defender General, and *William A. Nelson,* Appellate Attorney, Montpelier, for Appellant.

**Dooley, J.** This case raises the single issue of whether the provision of use and derivative use immunity to a reluctant witness pursuant to 12 V.S.A. § 1664(a) is consistent with the self-incrimination privilege established by Chapter I, Article 10 of the Vermont Constitution. We hold that it is consistent as long as "derivative use" is defined sufficiently broadly to provide equivalent protection to that provided by the privilege and certain procedural protections are afforded. We affirm.

The State charged defendant, Shawn Ely, with the second-degree murder of Eddie Billings, a two-year-old child, and subpoenaed Wanda Allard (hereinafter witness), the mother of Eddie Billings, to testify at a pretrial hearing. The witness appeared, but refused to testify, asserting her privilege against self-incrimination; she was offered use and derivative use immunity pursuant to 12 V.S.A. § 1664(a), but she continued to refuse to testify, asserting that only transactional immunity would be sufficient to provide her equivalent protection to the self-incrimination privilege. The trial court disagreed and held her in contempt.

Chapter I, Article 10 of the Vermont Constitution provides that "in all prosecutions for criminal offenses, a person . . . [cannot] be compelled to give evidence against oneself." Consistent with the self-incrimination privilege established in the Fifth Amendment to the United States Constitution, this privilege attaches and applies to a nondefendant witness who is compelled to testify in a civil or criminal proceeding. See *Maness v. Meyers,* 419 U.S. 449, 464-65 (1975); 12 V.S.A. § 1662. There is no dispute that the witness in this case had an Article 10 right to refuse to testify to the extent that testimony would involve giving evidence against herself.

Like all states and the federal government, Vermont has adopted an immunity law to require incriminating testimony, but to provide sufficient protection to the witness to replace the self-incrimination privilege. Although we have never squarely decided the question, the witness in this case does not argue that an immunity law can never replace the constitutional privilege. Our general immunity law was

first enacted in 1931, but applied only to misdemeanors. See generally *State v. Howard*, 108 Vt. 137, 142-43, 183 A. 497, 499 (1936). Up until 1973, the effect of testimony given under the immunity law was as follows:

> A person shall not be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing as to which, in obedience to a subpoena issued at the request of the state and under oath, he may so testify or produce evidence, and no testimony or evidence so given or produced shall be received against him . . . .

1933, No. 34, § 1. In the parlance used to describe immunity statutes, the Vermont law provided for both transactional and use immunity. Once the witness gave evidence under the immunity law, the witness could not be prosecuted for any transaction to which the witness testified or produced evidence — transactional immunity. Nor could the testimony or evidence be received against the witness — use immunity.

In 1972, the United States Supreme Court decided *Kastigar v. United States*, 406 U.S. 441 (1972), holding that immunity against use and derivative use of the coerced incriminatory testimony was sufficient to replace the Fifth Amendment privilege. *Id.* at 453. Like many states, Vermont amended its preexisting transactional immunity law to provide for use and derivative use immunity. Our immunity law, which applies to both misdemeanors and felonies, now provides in pertinent part:

> (a) Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to a court or grand jury of the state of Vermont, and the presiding judge communicates to the witness an order issued under subsection (b) of this section, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order, or any information directly or indirectly derived from such testimony or other information, may be used for any purpose, including impeachment and cross-examination, against the witness in any criminal case, except a prosecution for perjury, giving a false statement or otherwise failing to comply with the order. The state shall have the burden of proving beyond a

reasonable doubt that any proffered evidence was derived from sources totally independent of the compelled testimony. If the witness is subsequently charged with an offense, other than perjury, the court may order the return of all copies of his compelled testimony. . . .

(b) In the case of any individual who has been or may be called to testify or provide other information at any proceeding before or ancillary to a court or grand jury of the state of Vermont, the presiding judge may issue in accordance with subsection (c) of this section, upon the request of the attorney general or a state's attorney, an order requiring such individual to give testimony or provide other information which he refuses to give or provide on the basis of the privilege against self-incrimination, such order to become effective as provided in subsection (a) of this section.

(c) The attorney general or a state's attorney may request an order under subsection (a) of this section when in his judgment:

(1) the testimony or other information from such individual may be necessary to the public interest; and

(2) such individual has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self-incrimination.

12 V.S.A. § 1664. Unlike the earlier statute, the current law no longer provides transactional immunity to the witness. Also, unlike the earlier statute, it goes beyond use immunity to cover "information directly or indirectly derived from such testimony or other information," normally called "fruits" or "derivative use" information. It also imposes a new burden on the State in any prosecution of the witness to prove *beyond a reasonable doubt* that any evidence "was derived from sources totally independent of the compelled testimony."

As discussed below, it is clear that the Vermont immunity statute is broad enough to replace the self-incrimination privilege of the Fifth Amendment as construed in *Kastigar*. The witness argues, however, that it is not broad enough to replace the privilege created by Chapter I, Article 10 of the Vermont Constitution. In her view, only an immunity statute that provides transactional immunity for any actions disclosed in the coerced evidence would be sufficient to pass Vermont constitutional muster.

We must acknowledge at the outset that the state constitutional issue is unlike those that have emerged since the United States Supreme Court has applied the full extent of constitutional criminal procedure protections to the states. Normally, a criminal defendant is arguing that we should find a constitutional right that the United States Supreme Court has never found under the United States Constitution. In this case, the witness is arguing that we should apply federal constitutional law as it existed for nearly a century up until the *Kastigar* decision and not follow the change in the law created by *Kastigar*.

In *Counselman v. Hitchcock*, 142 U.S. 547 (1892), the Supreme Court considered whether a grand jury could require incriminating testimony pursuant to a statutory grant of use immunity covering such testimony. The Court noted that the statutory immunity

> would not[] prevent the use of his testimony to search out other testimony to be used in evidence against him or his property, in a criminal proceeding in such court. It could not prevent the obtaining and the use of witnesses and evidence which should be attributable directly to the testimony he might give under compulsion, and on which he might be convicted, when otherwise, and if he had refused to answer, he could not possibly have been convicted.

*Id.* at 564. For this reason, it found that the protection of the statute was not "coextensive with the constitutional provision" and detracted "from the privilege afforded by the Constitution." *Id.* at 565. After an exhaustive analysis of prior state and federal cases, the Court held:

> We are clearly of opinion that no statute which leaves the party or witness subject to prosecution after he answers the criminating question put to him, can have the effect of supplanting the privilege conferred by the Constitution of the United States. . . . In view of the constitutional provision, a statutory enactment, to be valid, must afford absolute immunity against future prosecution for the offence to which the question relates.

*Id.* at 585-86.

For eighty years, *Counselman* stood as the definitive statement on the ability to obtain incriminating testimony consistent with the Fifth Amendment through a grant of immunity, and federal statutes provided for transactional immunity to allow for such evidence. In the

1960's, however, the Supreme Court signaled that it might modify *Counselman* to the extent that it held that only transactional immunity was sufficient, see *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 79 (1964), and Congress passed a use and derivative use immunity statute. The Supreme Court upheld this statute in *Kastigar*, acknowledging that *Counselman* required transactional immunity, but holding that the language was only nonbinding dicta.

The Court explained:

> While a grant of immunity must afford protection commensurate with that afforded by the privilege, it need not be broader. Transactional immunity, which accords full immunity from prosecution for the offense to which the compelled testimony relates, affords the witness considerably broader protection than does the Fifth Amendment privilege. The privilege has never been construed to mean that one who invokes it cannot subsequently be prosecuted. Its sole concern is to afford protection against being "forced to give testimony leading to the infliction of 'penalties affixed to . . . criminal acts.'" Immunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom, affords this protection. It prohibits the prosecutorial authorities from using the compelled testimony in *any* respect, and it therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness.

406 U.S. at 453. It found the *Counselman* decision fully consistent with this reasoning because the concern in *Counselman* was the derivative use of evidence gained under a grant of immunity.

The Court responded to the argument that use and derivative use immunity was insufficient to provide the full protection afforded by privilege-protected silence. It specifically addressed the argument that "[i]t will be difficult and perhaps impossible . . . to identify, by testimony or cross-examination, the subtle ways in which the compelled testimony may disadvantage a witness." *Id.* at 459. It noted that the prohibition of the federal statute was sweeping and barred use of immunized testimony as an investigatory lead or to focus an investigation on a witness. *Id.* at 460. It also held that the protection does not depend on the good faith of the prosecutor because, once the witness discloses that he or she testified under a grant of immunity, the prosecution has the burden to show that the evidence being used

against the immunized witness came from legitimate sources, "wholly independent of the compelled testimony." *Id.* at 460. In the Court's view, these protections insured that the compelled testimony "can in no way lead to the infliction of criminal penalties." *Id.* at 461.

The practical difficulties in enforcing use and derivative use immunity prompted a dissent from Justice Marshall. Justice Marshall argued that enforcement of use and derivative use immunity inevitably depends on the integrity and good faith of the prosecutor because the knowledge necessary to show whether the immunized evidence has been used is wholly controlled by the prosecutor, and the prosecutor can always meet the burden of proof "by mere assertion" that will be undisputed. He added:

> Second, even [prosecutorial] good faith is not a sufficient safeguard. For the paths of information through the investigative bureaucracy may well be long and winding, and even a prosecutor acting in the best of faith cannot be certain that somewhere in the depths of his investigative apparatus, often including hundreds of employees, there was not some prohibited use of the compelled testimony.

*Id.* at 469.

In short, the issue before us is whether we should follow *Kastigar*, or some variation of the decision that will allow use and derivative use immunity, or follow *Counselman* and require transactional immunity. Although the issues have varied, the analysis of the meaning of provisions of our Constitution has become familiar. We look to "our own decisions, the wording of the text, historical analysis, construction of similar provisions in other state constitutions and sociological materials." *Benning v. State*, 161 Vt. 472, 476, 641 A.2d 757, 759 (1994).

Both parties have noted the textual distinction between the Fifth Amendment to the United States Constitution and Article 10 of the Vermont Constitution. The Fifth Amendment provides that no person "shall be compelled . . . to be a witness against himself"; Article 10 states that a person cannot "be compelled to give evidence against oneself." Witness argues that the term "evidence" is broader than the term "witness," and this breadth supports her argument. We have rejected this claim on a number of occasions, and we see no reason to

reexamine the point here.[1] See *State v. Picknell*, 142 Vt. 215, 227, 454 A.2d 711, 716 (1982) (majority of states have constitutional self-incrimination provisions different from that in Fifth Amendment, but courts have interpreted them to be consistent with Fifth Amendment); *State v. Brean*, 136 Vt. 147, 151, 385 A.2d 1085, 1088 (1978) (state and federal constitutional provisions, "although using slightly variant phraseology, have a common origin and a similar purpose"); *State v. Pierce*, 120 Vt. 373, 376-78, 141 A.2d 419, 421-22 (1958) (variations in constitutional language do not alter essential meaning; despite language of Article 10, it extends only to testimonial utterances); *State v. Baker*, 115 Vt. 94, 113, 53 A.2d 53, 64 (1947) (Moulton, C.J., dissenting) (language of Fifth Amendment "is the same in meaning as the corresponding phraseology of the Constitution of this State"); *In re Dewar*, 102 Vt. 340, 346, 148 A. 489, 491 (1930) (Fifth Amendment "is uniform in meaning with the provision of our Constitution herein directly involved"); see also *Schmerber v. California*, 384 U.S. 757, 761-62 n.6 (1966) (word "witness" in Fifth Amendment and word "evidence" in many state constitutions "should have as far as possible the same interpretation").[2]

Nor can we find much help in our prior decisions. Many of our sister states had decided immunity cases prior to the Supreme Court's *Counselman* decision, and that Court relied on these precedents. See, e.g., *Emery's Case*, 107 Mass. 172, 185 (1871) (in order to question witness on matter that will incriminate witness, transactional immunity must be provided); *State v. Nowell*, 58 N.H. 314, 315 (1878) (follows *Emery's Case*). We have no equivalent precedent.

Although both parties cite language from our cases, none of it gives us much help in deciding this case. In *Dewar*, we held that self-incrimination provisions "are of first importance and should be applied in a broad and liberal spirit to the end that the individual shall enjoy that complete immunity therein contemplated." 102 Vt. at 345,

---

[1] We do not suggest that if we agreed with witness, the breadth would mean that transactional immunity would be required. The New Jersey Supreme Court held that its constitutional provision grants broader self-incrimination protection than the Fifth Amendment, but nevertheless ruled that use and derivative use immunity is sufficient to supplant the privilege. See *State v. Strong*, 542 A.2d 866, 872 (N.J. 1988).

[2] Despite the number and uniformity of our decisions on this point, this appears to be an issue that does not go away. Noting the different language of the Fifth Amendment self-incrimination provision and Article 10, this Court stated in *State v. Jewett*, 146 Vt. 221, 226, 500 A.2d 233, 237 (1985), that "it is possible that [Article 10] could be construed differently from [the] somewhat similar provision[] in the Federal Constitution." Three years earlier in *Picknell*, 142 Vt. at 227, 454 A.2d at 716, we started our analysis by noting that this "is a matter of first impression for this Court."

148 A. at 490. In *State v. Baker*, a three-to-two decision, the majority of this Court upheld a statute that allowed the judge and prosecution to comment on the failure of the defendant to testify, and quoted with approval the following description of Article 10:

> "The history of the privilege, and the weight of authority, show that the constitutional provision was directed against torture, force, and the inquisitorial practices of past centuries. It has no concern with tactical refinements."

115 Vt. at 105, 53 A.2d at 59 (quoting *Opinion of the Justices*, 15 N.E.2d 662, 666 (Mass. 1938) (Lummus, J., dissenting)).

We disagree with the State's position that our decisions have endorsed use and derivative use immunity in this context. Our references to the concept involve the Fifth Amendment, see *State v. Couture*, 146 Vt. 268, 275, 502 A.2d 846, 851 (1985) (statement that "constitution only guarantees 'use and derivative use' immunity" specifically refers to the Fifth Amendment privilege), or a voluntary, judicially crafted remedy, to allow an accused in special circumstances to respond to adverse evidence without enabling the prosecutor to use the response in a separate criminal proceeding. See *State v. Loveland*, 165 Vt. 418, 422, 684 A.2d 272, 276 (1996); *State v. Cate*, 165 Vt. 404, 415-17, 683 A.2d 1010, 1018-19 (1996); *State v. Drake*, 150 Vt. 235, 237, 552 A.2d 780, 781 (1988); *In re Hill*, 149 Vt. 431, 439-40, 545 A.2d 1019, 1025 (1988); *State v. Begins*, 147 Vt. 295, 299, 514 A.2d 719, 722-23 (1986). These applications of use and derivative use immunity provide little assistance with the question before us.

Nor is this an issue on which history is much of a guide. The language of Article 10 is taken from the Virginia Declaration of Rights, and was adopted by many states. See E. Moglen, *Taking the Fifth: Reconsidering the Origins of the Constitutional Privilege Against Self-Incrimination*, 92 Mich. L. Rev. 1086, 1118 (1994). At the time of its adoption, and well into the nineteenth century, a criminal defendant was not allowed to testify under oath at his or her trial. See *Baker*, 115 Vt. at 100, 102, 53 A.2d at 57 (criminal defendants were not allowed to testify on own behalf until 1866; at time of adoption of constitution, drafters could not have conceived that defendants would ever be given right to testify). Criminal procedure assumed "the testimonial availability of the defendant at the crucial pretrial stage of the prosecution and freely made use of the defendant's admissions at trial." Moglen, *supra*, 92 Mich. L. Rev. at 1129. Thus, the issue before us was unknown at the time of the adoption of Article 10.

We find the most assistance in the decisions of other states. The courts of six states have rejected *Kastigar* and held that their constitutional self-incrimination provision requires transactional immunity in cases of compelled, incriminatory testimony. See *State v. Gonzalez*, 853 P.2d 526, 533 (Alaska 1993); *State v. Miyasaki*, 614 P.2d 915, 924 (Haw. 1980); *Attorney General v. Colleton*, 444 N.E.2d 915, 920 (Mass. 1982); *Wright v. McAdory*, 536 So. 2d 897, 904 (Miss. 1988); *State v. Soriano*, 684 P.2d 1220, 1234 (Or. Ct. App.), *aff'd*, 693 P.2d 26 (Or. 1984); *State v. Thrift*, 440 S.E.2d 341, 351 (S.C. 1994). Seven courts have held to the contrary, but in only two of these states, New Jersey and Pennsylvania, have the courts engaged in a detailed analysis of the issue. See *Patchell v. State*, 711 P.2d 647, 649 (Ariz. Ct. App. 1985); *In re Caito*, 459 N.E.2d 1179, 1183-84 (Ind.), *cert. denied*, 469 U.S. 805 (1984); *In re Criminal Investigation No. 1-162*, 516 A.2d 976, 981 n.3 (Md. 1986); *State v. Strong*, 542 A.2d at 872; *People v. Johnson*, 507 N.Y.S.2d 791, 793 (Sup. Ct. 1986); *Commonwealth v. Swinehart*, 664 A.2d 957, 969 (Pa. 1995); *Ex parte Shorthouse*, 640 S.W.2d 924, 928 (Tex. Crim. App. 1982).

Some of the decisions requiring transactional immunity rely on pre-*Kastigar* state constitution holdings. See, e.g., *Colleton*, 444 N.E.2d at 919 (relying on *Emery's Case*); *Thrift*, 440 S.E.2d at 350 (relying on *Ex parte Johnson*, 196 S.E. 164, 169 (S.C. 1938)). Most, however, are based on the policy grounds raised by Justice Marshall in his dissent in *Kastigar*. Thus, in *Gonzalez*, the Alaska Supreme Court acknowledged that in theory "strict application of use and derivative use immunity would remove the hazard of incrimination," but concluded that in practice the courts cannot "protect adequately against use and derivative use." 853 P.2d at 530. The court gave two reasons for its conclusion: (1) the evidence of use is all in the hands of the prosecution, and the defendant's proof difficulties are insurmountable; and (2) the State cannot meaningfully guard against nonevidentiary use — that is, use in focusing the investigation, deciding to prosecute, planning trial strategy and deciding whether to plea bargain. *Id.* at 530-32. In *Miyasaki*, the Hawaii Supreme Court voiced similar concerns and added the concern that a defendant would forego the right to testify rather than face a cross-examination informed by the compelled prior testimony. 614 P.2d at 924. The Oregon Court of Appeals summarized about the disclosure of incriminating testimony to the prosecution: "'It is unrealistic to give a dog a bone and to expect him not to chew on it.'" *Soriano*, 684 P.2d at 1234 (quoting *State ex rel. Johnson v. Woodrich*, 566 P.2d 859, 861 (Or. 1977)).

The decisions that have upheld use and derivative use immunity statutes under the applicable state constitution self-incrimination provision have, like *Kastigar*, stressed that transactional immunity grants amnesty, which is well beyond what the privilege protects. See *Strong*, 542 A.2d at 869; *Swinehart*, 664 A.2d at 968. The New Jersey court held that its constitution is more protective than the Fifth Amendment. Nevertheless, it held that use and derivative use immunity provides equivalent protection to a self-incrimination privilege which "mandates the strictest scrutiny of and the strongest protections against possible prosecutorial misuse of testimony." *Strong*, 542 A.2d at 872. To ensure that immunity provides equivalent protection, the court required that the prosecution prove by clear and convincing evidence that the evidence against the defendant was developed and obtained by means entirely independent of and unrelated to the compelled testimony, *id.*, that the compelled testimony not be used to develop trial strategy, *id.* at 877, and that a strict "but for" test be used in comparing the evidence against the defendant to the compelled testimony. *Id.* at 878.

The Pennsylvania court also adopted the clear-and-convincing-evidence standard in determining whether the evidence against the defendant came from sources wholly independent of the compelled testimony. See *Swinehart*, 664 A.2d at 969. The court acknowledged the difficulties in determining whether compelled testimony was used directly or indirectly in building the prosecution case, but held that on balance the right of the court to compel every person's testimony outweighed this practical concern. *Id.* at 968.

After considering the decisions from other jurisdictions, including from the United States Supreme Court, we are left with a single overriding question: whether use and derivative use immunity can be administered such that it provides protection equivalent to the self-incrimination privilege. We agree with the Supreme Courts of New Jersey and Pennsylvania that use and derivative use immunity best matches the protection afforded by the privilege and that transactional immunity goes further than the privilege, thereby allowing persons to escape criminal responsibility for their actions in cases where use of the privilege would not. We agree with the courts in other jurisdictions, however, that if transactional immunity is necessary to accord the full protection of the self-incrimination privilege, we must require it despite its undesirable side effect.

We address this question in the context of a specific statute that has four requirements to protect the rights of the witness whose evidence

is compelled. First it provides that no testimony, or other information compelled, "or any information directly or indirectly derived from such testimony or other information, may be used *for any purpose*" against the witness in a criminal case. 12 V.S.A. § 1664(a) (emphasis added). Second, it requires the State to prove that any evidence against the witness "was derived from sources totally independent of the compelled testimony." *Id.* Third, it requires that the State's proof meet an elevated standard of proof "beyond a reasonable doubt." *Id.* Fourth, it authorizes, but does not require, that the trial judge provide immunity and direct the witness to provide incriminating evidence. *Id.* § 1664(b); cf. *In re D.L.*, 164 Vt. 223, 234, 669 A.2d 1172, 1179-80 (1995) (use of "may" in inquest statute means that judge has discretion on whether to honor prosecutor's request to call an inquest).

We also address the question with the benefit of the record of twenty-five years of experience in applying the *Kastigar* standard, primarily in the federal courts. From that record, we conclude that use and derivative use immunity can be administered under our statute to provide protection equivalent to that afforded by the Article 10 self-incrimination privilege if we adhere to certain standards and procedural requirements.

First, as the statute requires, the burden to show nonuse of the compelled evidence lies with the State under an elevated standard of proof. This burden cannot be met by bare assertions of nonuse. See *United States v. Harris*, 973 F.2d 333, 337 (4th Cir. 1992). Instead, the State must show how it developed the evidence against the witness to demonstrate that its development was totally independent of the compelled evidence. Normally, it must do so at a hearing called for this purpose. See *United States v. North*, 910 F.2d 843, 854 (D.C. Cir.), *reh'g granted in part and denied in part*, 920 F.2d 940, 942-43 (D.C. Cir. 1990), *cert. denied*, 500 U.S. 941 (1991).

Second, with respect to immunity given under § 1664(a), the court should ordinarily require that the State provide a written statement (called "canning") of all evidence it has against the witness prior to the compelled disclosure. See *North*, 910 F.2d at 872-73. This statement should be sealed and filed with the court order compelling the evidence. If the witness is subsequently charged with a crime about which testimony is compelled under the statute, the statement is available to the court and the defendant to aid in determining whether compelled evidence was used in connection with the criminal case.

■ Third, the statutory prohibition on use "for any purpose" extends both to evidentiary and nonevidentiary use. The decisions following *Kastigar* have split on whether use and derivative use immunity under that decision prohibits nonevidentiary use, which is defined in the leading case of *United States v. McDaniel*, 482 F.2d 305, 311 (8th Cir. 1973), to include "assistance in focusing the investigation, deciding to initiate prosecution, refusing to plea-bargain, interpreting evidence, planning cross-examination, and otherwise generally planning trial strategy." Under the general rationale that it goes too far to prohibit use of immunized testimony to tangentially influence the prosecutor's thought process in preparing the indictment and preparing for trial, the Second Circuit Court of Appeals has held that *Kastigar* does not prohibit nonevidentiary use of immunized testimony. See *United States v. Mariani*, 851 F.2d 595, 600 (2d Cir. 1988), *cert. denied*, 490 U.S. 1011 (1989). Some courts have followed *Mariani*, see *United States v. Crowson*, 828 F.2d 1427, 1431-32 (9th Cir. 1987), *cert. denied*, 488 U.S. 831 (1988); *United States v. Byrd*, 765 F.2d 1524, 1528-31 (11th Cir. 1985), and others have followed *McDaniel* in prohibiting nonevidentiary use. See *United States v. Semkiw*, 712 F.2d 891, 895 (3d Cir. 1983); *State v. Gault*, 551 N.W.2d 719, 725 (Minn. Ct. App. 1996); *Strong*, 542 A.2d at 877.

We need not resolve the conflict over the meaning of *Kastigar* or the federal immunity statute. Our statute is written broadly to prohibit use for any purpose, and the plain meaning of the words extends to nonevidentiary use. We are persuaded that the burden on the prosecution to show how it developed its case, with the high standard of proof, is sufficient to uncover instances of nonevidentiary use.

■ Fourth, the prohibition on use or derivative use extends not only to prosecutors and law enforcement personnel but to fact witnesses whose discovery or motivation to provide evidence is related to the immunized testimony or whose evidence is shaped by that testimony. See *North*, 910 F.2d at 860; *Strong*, 542 A.2d at 876-77. The prosecution of an immunized witness must meet a strict "but for" test — any evidence that would not have been available in the form provided at trial, but for the immunized testimony of the defendant, cannot be used because it is not "totally independent of the compelled testimony." 12 V.S.A. § 1664(a).

■ Finally, we emphasize that the trial judge has discretion to refuse to compel testimony under a grant of use and derivative use

immunity. Recognizing that in some cases, despite all precautions, use and derivative use immunity is inadequate to replace the privilege, the statute authorizes the attorney general or state's attorney to offer, and the court to order, transactional immunity to a witness. 12 V.S.A. § 1664(a). Using this authority, the court may in a particular case conclude that precautions are inadequate to protect a witness's privilege and only transactional immunity will suffice. In such a case, the court may refuse to compel testimony unless transactional immunity is afforded by the prosecution.

 Because of the requirements we have imposed on the administration of use and derivative use immunity, we address the question of access to immunized evidence. Our statute, and this decision, prohibit use of the evidence against the immunized witness; they do not prohibit access to such evidence. See *United States v. Serrano*, 870 F.2d 1, 17 (1st Cir. 1989) (purpose of Fifth Amendment is not "frustrated by the government's mere exposure to immunized testimony"). Indeed, prosecutorial access is necessary to prosecute the original target or another target separate from the immunized witness.

 Nevertheless, it will be difficult, if not impossible, for a prosecutor of the immunized witness to show nonuse if there is widespread access to the immunized evidence by the prosecutor, law enforcement personnel and other witnesses. To prevent unnecessary access to immunized evidence, the court may consider prohibiting public access to it by closing the proceeding and sealing the evidence.[3] We recommend that prosecutors and law enforcement agencies adopt procedures that will limit access to immunized evidence, and that persons who investigate or prosecute immunized witnesses be separate from those who had access to the immunized testimony.

We believe that in Vermont, under the above requirements, use and derivative use immunity is consistent with Chapter I, Article 10 of the Vermont Constitution. We acknowledge that these requirements are strict and may, in some cases, require transactional immunity especially if prosecutors and law enforcement personnel who seek evi-

---

[3] We recognize that the public has a qualified First Amendment right of access to criminal proceedings and that right of access may be overridden in certain circumstances. See *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 9-10 (1986). We do not attempt in this decision to resolve when the court may close proceedings and seal evidence to limit access for those who might investigate or prosecute the immunized witness.

dence under immunity orders do not adopt procedures that eliminate or minimize the misuse of immunized evidence.

*Affirmed and remanded for further proceedings consistent with this decision.*