507 S.E.2d 688

**STATE of West Virginia, Appellee,**

v.

**Jacob W. BEARD, Appellant.**

**No. 24644.**

Supreme Court of Appeals of
West Virginia.

Submitted June 9, 1998.

Decided July 15, 1998.

Defendant was convicted of first-degree murder. Defendant appealed. The Supreme Court of Appeals, 194 W.Va. 740, 461 S.E.2d 486, remanded for *Kastigar* hearing to determine whether state could prove that indictment and conviction were obtained without violating use immunity agreement granted to defendant. The Circuit Court, Greenbrier County, Charles M. Lobban, J., ruled that state did not violate use immunity agreement. Defendant appealed. The Supreme Court of Appeals, Workman, J., held that: (1) state did not obtain indictment in violation of *Kastigar* principles; (2) state did not violate *Kastigar* principles by allegedly altering its position as to time frame of murders to refute defendant's alibi defense; and (3) any violations of *Kastigar* principles were harmless beyond a reasonable doubt.

Darrell V. McGraw, Jr., Attorney General, Barbara H. Allen, Managing Deputy Attorney General, Charleston, West Virginia, Attorney for Appellee.

J. Miles Morgan, Stephen B. Farmer, Farmer, Cline & Arnold, Charleston, West Virginia, Attorneys for Appellant.

WORKMAN, Justice:

Appellant Jacob Beard (hereinafter referred to as "Defendant") seeks a reversal of the ruling issued by the Circuit Court of Greenbrier County[1] on September 4, 1996, with regard to the circuit court's conclusion following a *Kastigar*[2] hearing that the State had not violated the use immunity agreement it entered into with Defendant. Upon a complete review of the transcript from the proceedings and the arguments of counsel, we determine that any possible error connected to the immunized testimony was harmless beyond a reasonable doubt and accordingly, we affirm the lower court's ruling.

## I. PROCEDURAL BACKGROUND

As a result of Defendant's prior appeal to this Court in 1995 from his first degree murder convictions for the locally infamous "Rainbow murders," we remanded for a *Kastigar* hearing to determine whether the State could prove that its indictment and conviction of Defendant were obtained without violating the use immunity agreement granted to Defendant in 1983. *State v. Beard,* 194 W.Va. 740, 756–57, 461 S.E.2d 486, 502–03 (1995). Since the trial court had

---

1. Due to a change of venue motion, this case was tried in Greenbrier County, rather than in Pocahontas County where the murders actually occurred.

2. *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

failed to conduct a *Kastigar* hearing,[3] -we held in *Beard* I:

> [R]emand is necessary for the limited purpose of allowing the State the opportunity to prove that the evidence used to indict and convict Appellant was derived from legitimate sources wholly independent of his immunized testimony. If the State meets its burden, then Appellant's conviction stands. Upon the failure of the State to make such a showing, however, the indictment must either be dismissed or a new trial awarded, unless the error is determined to be harmless beyond a reasonable doubt.

*Id.* Our ruling in *Beard* I was compelled by the United States Supreme Court's decision in *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), in which the Fifth Amendment's protections against compelling an individual to testify against himself when viewed in conjunction with a federal use immunity statute[4] were held to

> provide[ ] a sweeping proscription of any use, direct or indirect, of the compelled testimony and any information derived therefrom.... This total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an 'investigatory lead,' and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures.

*Id.* at 460, 92 S.Ct. 1653.

On remand, a lengthy *Kastigar* hearing was held over a period of five separate days during which the State presented evidence from numerous individuals who were involved in either investigating or prosecuting Defendant for the Rainbow murders. In addition to cross-examining the State's witnesses at the *Kastigar* hearing, Defendant testified as to matters relevant to the use immunity agreement and events transpiring thereafter. Following the conclusion of the evidence, the trial court ruled from the bench on July 9, 1996, and then issued its order reflecting such rulings on September 4, 1996. In its thorough twenty-six page order, the lower court carefully considered whether the State made direct or indirect use of the information[5] offered by Defendant in connection with the grant of use immunity provided him by the State.

In its *Kastigar* order, the circuit court reviewed the testimony of each of the trial witnesses to explore whether the identity of those individuals and the information to which they testified were discovered as a result of information Defendant provided the State. With the possible exception of Christine Cook and Karen Willis, the circuit court concluded that each of the remaining witnesses were discovered independently. The trial court also ruled that Defendant's time card reflecting his work record on the date of the murder could not be determined to have been located separate from information provided by Defendant.[6] In considering whether the testimony of Ms. Cook and Ms. Willis and the time card's introduction into evidence could have contributed to Defendant's conviction, the circuit court concluded that such evidence was not inculpatory evidence.[7]

---

3. Defendant had requested pre-trial that a *Kasti-gar* hearing be held, but the trial court denied the motion. In its ruling from the bench on July 9, 1996, in connection with the *Kastigar* hearing, the circuit court acknowledged that when the issue of holding such a hearing was first raised, it "didn't quite recognize the duties that were incumbent upon it, and did not do so at that particular point in time."

4. 18 U.S.C. § 6002 (1994).

5. Defendant was never compelled to testify in any proceeding in connection with his execution of the use immunity agreement.

6. Because the evidence was controverted as to whether Sergeant Alkire actually retrieved Defendant's time card in 1982 after Defendant

made phone calls to Mr. Durian, one of the victim's father, *see infra* note 8, or immediately following the execution of the immunity agreement, the trial court ruled that such evidence could not be viewed as having been obtained independent of any information provided by Defendant.

7. Ms. Cook, who testified at trial regarding the identity of those individuals present on Droop Mountain on the afternoon of the murder, never identified Defendant as being present on that date. Ms. Willis, the records keeper at Defendant's place of employment, testified that it was routine for employees of Greenbrier Tractor Sales to pencil in times on their time cards when they went out on a job to do work for customers. Defendant's time card for the date of the murder

Given the absence of any incriminating evidence arising from the testimony of Ms. Cook, Ms. Willis, or the physical evidence of the time card, combined with the fact that the remaining evidence used to convict Defendant was obtained independently, the trial court rejected Defendant's position that his conviction had been obtained through tainted evidence.

## II. STANDARD OF REVIEW

■ Our review of the circuit court's ruling on the *Kastigar* issue is subject to the clearly erroneous standard. In *United States v. Harris*, 973 F.2d 333 (4th Cir.1992), the court stated in connection with its review of a *Kastigar* ruling, "[w]hen the [trial] court uses correct legal principles, its taint determination is a factual finding subject to review under the clearly erroneous standard." *Id.* at 337 (citing *United States v. Jones*, 542 F.2d 186, 199 (4th Cir.), *cert. denied*, 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375 (1976)).

■ The standards that the lower court was required to follow in making its *Kastigar* rulings were two-fold. First, the State had the burden of demonstrating by a preponderance of the evidence that the evidence used to indict and convict Defendant was obtained independent of any use-immunized testimony. *United States v. North*, 910 F.2d 843, 854, *modified in part*, 920 F.2d 940 (D.C.Cir. 1990), *cert. denied*, 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991). Then, if the trial court determines, as it did in this case, that the State has not met its burden with regard to any of the evidence, the court is required to make a determination of whether the admission of such non-independent evidence was harmless beyond a reasonable

doubt. Since the record indicates that the trial court both understood and applied the correct burdens and standards in making its *Kastigar* ruling, we can reverse the decision below only upon a determination that the lower court was clearly erroneous.

## III. DISCUSSION

### A. The Investigation

The murders for which Defendant was convicted occurred on June 25, 1980. Defendant first came under suspicion when he placed several anonymous phone calls to one of the victim's parents in July 1982.[8] As a result of a separate criminal matter involving misdemeanor charges of animal cruelty, Defendant entered into a use immunity agreement with the State on February 3, 1983. *See Beard I*, 194 W.Va. at 755, 461 S.E.2d at 501. In exchange for a dismissal of the animal cruelty charges, Defendant agreed to provide the State with information regarding the Rainbow murders. The State granted Defendant immunity in connection with the Rainbow murders for any after-the-fact involvement he may have had, but expressly denied immunity to Defendant for involvement as either a principal or an accessory before the fact.[9]

After signing the use immunity agreement, Defendant submitted to two polygraph examinations[10] concerning his knowledge regarding the murders and his whereabouts on the date of the murders. Defendant consistently stated that he was at work at Greenbrier Tractor Sales on the date of the murder until around 1:00 p.m. when he went out in the field to do some work for a customer. He

---

showed that he had clocked out at 1:15 p.m. and pencilled in a hand-written entry of 5:15 for his quitting time on the date of the murder.

8. A tap was placed on Mr. Durian's phone and Defendant's identity was discovered when he placed a second call to the same residence. During the phone conversation, Defendant indicated that the police were not doing their job with regard to investigating the murders and stated that his interest in the matter arose from the fact that he had a daughter. Defendant also stated that he was not the murderer.

9. *See Beard* I, 194 W.Va. at 755, 461 S.E.2d at 501 (stating the text of the use immunity agreement).

10. Although we ruled in syllabus point one of *Beard* I that polygraph evidence is not admissible evidence in a criminal trial, 194 W.Va. at 744, 461 S.E.2d at 490, we note that the polygraph tests administered to Defendant on February 3, 1983, clearly showed deceptive responses to questions related to the Rainbow murders. It is puzzling why, given Defendant's deceptive responses, he was not viewed by the state police, according to the testimony of Sergeant Alkire, as a serious suspect beginning in 1983.

stopped by the store on his way home from work around 5:15 p.m. and then attended a school board meeting that evening around 7:00 p.m.[11] He denied having any knowledge regarding the murders which had occurred on Droop Mountain, but indicated that on his way home from work around 5:30 p.m. he saw Christine Cook's vehicle at an entrance to the Droop Mountain Park known as "Lover's Lane." Present with Ms. Cook, according to Defendant, were Paulmer "Buddy" Adkison and Bill McCoy, as well as two girls who might have been the Rainbow girls.[12]

Apparently as a result of the information Defendant provided during his polygraph on February 3, 1983, Christine Cook was polygraphed on February 7, 1983. Ms. Cook had previously been questioned by the State police twice[13] and stated that she was not in the area of Droop Mountain after 3:00 or 4:00 p.m. on the date of the murders and had no knowledge regarding the murders. Although Defendant strenuously asserts that Christine Cook changed her testimony when she was polygraphed on February 7, 1983, the record does not support this assertion. According to the record, Ms. Cook first admitted to being with the group of "relevant necessary people"[14] on Droop Mountain when she was re-questioned by the police on April 29, 1992. At that time, she admitted to being on Droop Mountain with "Buddy" Adkison, Bill McCoy, Richie Fowler, Arnie Cut-

lip, and Gerald Brown on the date of the murders, possibly as late as 5:00 p.m.

Three days after his polygraph, Defendant called Sergeant Robert Alkire of the State Police to tip him off to what is now believed to be a fabricated murder case known as the "corn chopper" incident. Defendant reported to Sergeant Alkire that another Rainbow member was murdered in September of 1980, and her body had been put through a corn chopper owned by Defendant.[15] Although that case was ultimately closed when no body was ever discovered,[16] Sergeant Alkire testified that he worked closely with Defendant chasing down leads, and as a result of Defendant's cooperation with the State Police concerning that alleged incident, he was not being seriously pursued as a suspect in connection with the Rainbow murders during that time period. Sergeant Alkire further testified that the State Police were not actively investigating Defendant for the Rainbow murders from 1985 to 1991.

The Pocahontas County Sheriff's Department renewed[17] its separate investigation into the Rainbow murders in 1985 when Jerry Dale took office as sheriff. During this period of the local investigation, deputy Allen Tracy made a handwritten note in 1986 regarding Alice Roberts that apparently was not fully investigated. At some point in 1990 or 1991, the Pocahontas County Prosecuting Attorney, Walt Weiford, encouraged the Sheriff's Department to share its investigato-

---

11. Several individuals confirmed Defendant's presence at the school board meeting on the evening of the murders.

12. Defendant testified that Ms. Cook was sitting in the middle of the car's front seat, that the Rainbow girls were in the backseat, and that Messrs. Adkison and McCoy were standing on either side of the vehicle.

13. Christine Cook gave statements to the State Police regarding her knowledge of the Rainbow murders on July 4, 1980, and on September 8, 1982. She was immediately questioned by the police following the murders, apparently due to the fact that her boyfriend "Buddy" Adkison was considered a suspect. Thus, the police had clearly spoken to Ms. Cook before her name was ever provided by Defendant.

14. This term was coined by the State in its prosecution of Defendant at trial and Defendant re-

peatedly uses this term on appeal to argue that Christine Cook was the critical witness to place the group of relevant individuals on Droop Mountain on the date of the murders.

15. Defendant told Sergeant Alkire that "Buddy" Adkison and Arnie Cutlip brought the body of an already deceased girl to his property and that he witnessed the processing of the body through the corn chopper.

16. Arnie Cutlip was held six months in jail for the "corn chopper" murder following a magistrate's finding of probable cause. The record suggests that no indictment was ever issued for the alleged murder.

17. From the very beginning of the investigation, the State Police and the Sheriff's Department had conducted separate investigations into the Rainbow murders with little or no cooperation between the two divisions of law enforcement.

ry materials with the State Police. As a result of this late-coming cooperation, Sergeant Alkire saw deputy Tracy's note regarding Alice Roberts and tracked down Mrs. Roberts. Mrs. Roberts directed Sergeant Alkire to her daughter, Pam Wilson, who actually saw two "hippie-type" women get into a blue van driven by Richie Fowler on the date of the murder. Ms. Wilson further testified at Defendant's criminal trial that she believed she saw Bill McCoy and Winters "Pee Wee" Walton with Richie Fowler that afternoon. After being subjected to police interrogation, "Pee Wee" Walton told the State Police that he saw Defendant commit the murders. A second individual, Johnnie Lewis, similarly admitted that Defendant was the trigger man following police interrogation.

During this same time period—1990 or 1991—a separate incident occurred where a Rainbow member committed suicide in the Pocahontas County jail. After the suicide, a Rainbow family member advised the local law enforcement that they should renew their investigation into the Rainbow murders and specifically suggested that they speak to Tina Hirzel regarding her knowledge about the murders. When Tina Hirzel was questioned, she provided hearsay information [18] that the murder victims had been picked up in Richie Fowler's van and then she named four or five individuals responsible for the murders, one of whom was Defendant.

Additional trial witnesses were discovered during the 1991 phase of the investigation conducted pursuant to the joint efforts of the State Police and the Sheriff's Department. Steve Goode reported seeing the blue van at Gerald Brown's residence on the evening of the murder. He indicated that Gerald Brown, Richie Fowler, and Defendant were at the Brown residence around 6 p.m. on the date of the murder. Mr. Goode testified that the Fowler van was backed into the Brown residence and that the three individuals were engaged in hosing out the van. Another individual, Mike Hively, observed the Fowler van at the Brown residence that same evening. William Scott testified that he saw Defendant driving out of Droop Mountain Park at approximately 3:30 or 3:45 p.m.[19] at a high rate of speed on the date of the murder. Odessa Hively[20] testified that she saw Defendant's vehicle, but not him, at the entrance to Droop Mountain Park between 5:30 and 6:00 p.m. As to the time of the murders, Virginia Schoolcraft[21] testified that she heard two rapidly-fired gunshots on the date of the murders between 4:00 and 4:15 p.m. In 1991, a statement was taken from an incarcerated Keith Cohenour[22] concerning the fact that he had heard Defendant state, while at the Gerald Brown residence several months after the murders, that everyone should just keep their mouths shut.[23]

On April 16, 1992, indictments for the Rainbow murders were issued against Defendant, Richie Fowler, Gerald Brown, Bill McCoy, Arnie Cutlip, "Pee Wee" Walton, and

---

18. The source of Ms. Hirzel's information was David Adkison, the brother of "Buddy" Adkison.

19. When originally questioned in 1985, he stated that it was late in the afternoon. At trial he testified that he had gotten off work at 3:00 p.m., purchased gas, and then saw Defendant somewhere between 3:30 and 3:45 p.m. on that date while on his way home.

20. Because Defendant had provided Mrs. Hively's name as someone who could verify his attendance at the school board meeting on the evening of the murder, he argues that her identity as a witness was not obtained independently. The trial court dismissed this contention due to the fact that Mrs. Hively's name had been noted separately back in 1986 by deputy Tracy.

21. As Ms. Schoolcraft was interviewed by the state police on the day after the murders, there is

no dispute that she was an independently discovered witness.

22. The trial court rejected Defendant's contention that Mr. Cohenour's name had been discovered as a result of Defendant having given the police the name of Lester Goode. Defendant argued that since Mr. Goode was a friend of Mr. Cohenour, Mr. Cohenour's identity was not discovered independently. The trial court determined that Mr. Cohenour's name had been noted independently by deputy Tracy in 1986 and was not in any way connected to information provided by Defendant.

23. Mr. Cohenour testified that Defendant "told Gerald [Brown] to make sure that he kept his mouth shut and everything would be all right" and to "[m]ake sure his peons did, too."

Johnny Lewis. Issues of police misconduct and questions regarding the credibility of the evidence resulted in the dismissal of these indictments on July 17, 1992. *See Beard* I, 194 W.Va. at 745, 461 S.E.2d at 491. On January 13, 1993, five of the original indictees, including Defendant, were re-indicted for the Rainbow murders.[24]

### B. The Indictment

Defendant argued below that the indictment issued against him was obtained in violation of *Kastigar* principles based on the fact that a statement he gave to Florida police upon his arrest for the Rainbow murders was read to the grand jury. Upon his arrest for the Rainbow murders in April 1992, Defendant provided a statement to the police after being Mirandized in which he stated his alibi for the date of the murders.[25] Approximately one week before the indictment was issued, Defendant's counsel wrote a letter to the Prosecuting Attorney demanding that exculpatory alibi evidence be presented to the grand jury. Rather than presenting numerous alibi witnesses, the State read into evidence the Florida statement which fully sets forth Defendant's alibi.

 The trial court found that because the State had an obligation to provide any exculpatory information to the grand jury, the reading of the statement to the grand jury was not a violation of *Kastigar.* Because there was no incriminating information in the Florida statement,[26] we cannot find a *Kastigar* violation through the reading of the Florida statement to the grand jury.[27]

### C. The Conviction

Defendant argues that the State wrongly used evidence that it obtained from him following the use immunity agreement to obtain his conviction. Specifically, Defendant asserts that the State altered its position as to the time frame of the murders in order to refute his alibi defense. In addition, Defendant maintains that he led the police to Christine Cook and that she was the critical witness whose testimony resulted in his conviction. Defendant also claims that the State's failure to take any steps whatsoever to isolate those individuals with knowledge of his statements made in connection with the grant of use immunity requires the conclusion that *Kastigar* has been violated given the likelihood that Defendant's alibi information played a role in the way this case was both investigated and prosecuted.[28]

---

**24.** "Pee Wee" Walton and Johnnie Lewis were not re-indicted, as they had been given immunity by the State. Defendant was the only individual ever tried by the State for the Rainbow murders. The record is silent as to why the other individuals who were indicted for the murders were never brought to trial.

**25.** The Florida statement contained the following information: (1) Defendant left work at 5:00 p.m. on 6/25/80; (2) Defendant called his wife before leaving work; (3) Defendant's wife asked him to pick up milk on the way home; (4) Defendant and his wife planned to attend a school board meeting that evening at 7:00 p.m.; (5) Defendant stopped at J & K Market on the way home; (6) Defendant and his wife attended the School Board meeting; (7) Defendant's wife left the meeting at 9:30 p.m. to go to work; and (8) Defendant got a ride home with Roger and Patty Pratt.

**26.** The underlying concern in any *Kastigar* inquiry is that an individual not be compelled to give incriminating evidence in exchange for immunity that is then later used to secure a conviction against that person for the same crime about which he provided immunized testimony. *See Kastigar*, 406 U.S. at 453, 92 S.Ct. 1653. In marked contrast to the typical *Kastigar* scenario,

none of the information that Defendant ever provided to law enforcement officials was self-incriminating.

**27.** The State argues additionally, citing *United States v. Lipkis*, 770 F.2d 1447 (9th Cir.1985), that the Florida statement was outside the specific umbrella of the use immunity agreement. Since the use immunity afforded Defendant applied to statements made to West Virginia authorities, the State maintains that the Florida statement made a decade after the original immunity grant, post-arrest for a crime expressly outside the corners of the immunity agreement, and to authorities in a separate jurisdiction eliminates even the possibility that the Florida statement could be viewed as violating the use immunity agreement. Given the lower court's conclusion that the presentment of the Florida statement to the grand jury involved exculpatory evidence only, we need not further address this argument.

**28.** Defendant seeks to have this Court extend the rulings of *Kastigar* and *Harris* in a fashion compatible with the Eighth Circuit Court of Appeals' decision in *United States v. McDaniel*, 482 F.2d 305 (8th Cir.1973). In that case, which is recog-

### 1. Time Frame

As to the altered time frame contention, Defendant cites evidence presented at trial by the chief medical examiner, Dr. Irvin Sopher, and Elizabeth Johndrow. Whereas Dr. Sopher had initially estimated the time of death at 7:00 p.m. or later, at trial he altered his previous opinion by testifying that the murder could have been committed anytime between 4:00 and 8:00 p.m.[29] The trial court, in its order, observes that time of death pronouncements are by their very nature subjective and not capable of scientific precision. With regard to Elizabeth Johndrow, the traveling companion of the Rainbow victims, the trial court took judicial notice of the fact that her initial statements[30] that she separated from the victims in Richmond, Virginia, at noon on June 25, 1980, would not have physically permitted the women, who were hitchhiking, to be in Pocahontas County at the time of the murder.[31]

■ Based on the foregoing, we do not find that the trial court was clearly erroneous in its ruling that no *Kastigar* violation arose by virtue of these two witnesses' altered trial testimony. Moreover, we observe that there were other witnesses such as Steve Goode and William Scott, whose discovery and identity cannot be tied to Defendant, whose statements would support the State's theory relative to an earlier time of death.

### 2. Christine Cook

Defendant strenuously argues that were it not for Christine Cook's testimony, he would not have been convicted. According to Defendant, she is the only one who actually placed him on Droop Mountain on the date of the murder. In making this argument, however, Defendant omits reference to the two eye-witnesses in this case—"Pee Wee" Walton and Johnny Lewis. He also turns a blind eye to the testimony of William Scott indicating that he saw Defendant coming out of Droop Mountain Park at approximately 3:45 p.m. on the date of the murders.

Christine Cook never testified that she saw Defendant on the date of the murders on Droop Mountain. She consistently stated that she did not know who Defendant was and that he was not among the group of

---

nized as the seminal decision on the issue of non-evidentiary uses of immunized testimony, the court of appeals held that the proscription against indirect use of immunized testimony announced in *Kastigar* extended to "all prosecutorial use of the testimony, not merely that which results in the presentation of evidence before the jury." *Id.* at 311. As examples of proscribed indirect use, the *McDaniel* court identified "assistance in focusing the investigation, deciding to initiate prosecution, refusing to plea-bargain, interpreting evidence, planning cross-examination, and otherwise generally planning trial strategy." *Id.* The Fourth Circuit has yet to adopt this approach and we do not resolve today whether non-evidentiary uses, such as those articulated in *McDaniel*, are included within the proscribed uses covered by *Kastigar*. We do note, however, that the Fourth Circuit made clear in *Harris* that investigatory use of immunized testimony falls within the umbrella of *Kastigar*'s protections. 973 F.2d at 336–37.

**29.** Because Defendant's alibi was stronger from 7:00 p.m. on when witnesses verified that he was in attendance at the school board meeting, Defendant argues that the State impermissibly used his alibi information to move the time of death forward to a time when his alibi was less tight.

**30.** Defendant stresses that Ms. Johndrow had, prior to trial, stated on as many as eight separate occasions, that she was certain she had departed from the victims at noon on June 25, 1980.

**31.** The trial court took judicial notice of the fact that approximately 4.5 hours of driving time were necessary to travel from Richmond, Virginia, to Pocahontas County, West Virginia. According to the trial testimony of Pam Wilson, she saw the two "hippie-type" girls get into Richie Fowler's van at approximately 3 p.m. on the date of the murder. Additional evidence concerning time that would impact on the likelihood that Ms. Johndrow was mistaken as to the date when she left the murder victims was offered through Virginia Schoolcraft who testified as to hearing two rapidly-fired gunshots between 4:00 and 4:15 p.m. on the date of the murders. While the trial court's conclusion that the traveling time between Richmond and Pocahontas County necessarily rendered Ms. Johndrow's testimony regarding the date she departed from the murder victims subject to alteration by the State, this conclusion is not unassailable. However, for the reasons stated in the text where we observe that the testimony of such irrefutably independent witnesses as William Scott and Steve Goode may have suggested a need to reconsider what time the murders occurred, we do not find reversible error in the possibility that Ms. Johndrow's departure testimony may have been altered with awareness of Defendant's alibi.

individuals with whom she was associating on Droop Mountain on that date. Only on further questioning by the State at trial, did Ms. Cook state that it was possible that Defendant was there, but she remained adamant in her position that she never saw him.

Defendant's real concern with regard to Ms. Cook is that she identified the group of so-called "relevant necessary people"[32] that were up on Droop Mountain on the date of the murder. While Ms. Cook did ultimately identify Bill McCoy, Gerald Brown, Arnie Cutlip, "Pee Wee" Walton, Johnnie Lewis, and Richie Fowler as being on the mountain that afternoon when she was re-questioned by the State Police on April 29, 1992, the police already had located through independent sources the two eye-witnesses to the crime—"Pee Wee" Walton and Johnny Lewis. And critically, they had been led to those individuals not by Christine Cook, but as a result of the note made by deputy Tracy in 1986 that Sergeant Alkire then investigated in 1990 or 1991, which led to Pam Wilson.[33] Contrary to the position advocated by Defendant, Pam Wilson, rather than Christine Cook, was the lynchpin in the State's investigation of Defendant.

### D. *Kastigar* Ruling

The circuit court determined that, notwithstanding the State's failure to completely satisfy the *Kastigar* requirements regarding the trial testimony of Christine Cook and Karen Willis, and the physical evidence of Defendant's time card, such evidence could not have contributed to Defendant's conviction because of its exculpatory nature.[34] As stated above, the standard by which the trial court was required to examine the possible *Kastigar* violations was whether any error associated with the admission of this evidence is harmless beyond a reasonable doubt. *See North,* 910 F.2d at 854. In weighing the issue of whether evidence is harmless beyond a reasonable doubt, the United States Supreme Court stated in

*Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), that there are two approaches to such an inquiry: (1) was there "a reasonable possibility that the evidence complained of might have contributed to the conviction;" or (2) did the beneficiary of constitutional error prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. *Id.* at 23–24, 87 S.Ct. 824 (quoting *Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963)). In a subsequent case, *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), the Supreme Court examined the harmless error beyond a reasonable doubt standard in the context of a defendant's denial of an opportunity to impeach a prosecution witness for bias and stated that a number of factors were to be considered: the importance of the witness' testimony, whether the testimony was cumulative, the presence or absence of corroborating or contradicting testimony on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case. *Id.* at 1438.

In making its determination that the possible error in introducing evidence from Ms. Cook, Ms. Willis, and the time card itself, was harmless beyond a reasonable doubt, the trial court exhaustively reviewed the evidence presented at trial and at the *Kastigar* proceedings to examine whether the evidence used to convict Defendant flowed from sources independent of the information provided by Defendant. The lower court concluded that the discovery of Pam Wilson by Sergeant Alkire in 1991 was independent of any information provided by Defendant and that she witnessed the two "hippie-type" girls "meeting the Rainbow murder victims['] description get into the van operated by Mr. Fowler, with Bill McCoy and Winters Walton present." As to the two eye witnesses, "Pee Wee" Walton and Johnnie Lewis, the trial court determined that their names "in no way came through any information furnished or disclosed by" Defendant.

---

**32.** *See supra* note 14.

**33.** While the trial court, in its *Kastigar* order, attributes the location of Pam Wilson to information provided by Tina Hirzel, the evidence presented at the *Kastigar* hearing clearly demonstrates that Ms. Wilson's identity resulted from

deputy Tracy's handwritten note in 1986. Regardless of which of these individuals led to Ms. Wilson, she was discovered independent of any information provided by Defendant.

**34.** *See supra* note 7.

The court went through this same process with the additional witnesses of Bill Scott, Steve Goode, Mike Hively, Odessa Hively,[35] and Keith Cohenour, and determined that each of those witnesses was obtained separately from any information provided by Defendant. Upon our review of the record in this case, we cannot conclude that the lower court was clearly erroneous in ruling that any *Kastigar* violations [36] that occurred in this case did not warrant a new trial as such error was harmless beyond a reasonable doubt.

▆ While we uphold the trial court's conclusion that the State's indictment and conviction of Defendant were obtained by evidence procured independent of that information provided by Defendant, we feel compelled to make certain observations about the manner in which the State proceeded to investigate and prosecute this case following the use immunity agreement. The law is clear that once a defendant is granted use immunity, out of an abundance of caution, the State should, when possible,[37] insulate any investigators and prosecutors who are familiar with the immunized statement from subsequent investigation and prosecution of the compelled witness and/or seal any incriminating documents obtained as the result of a grant of immunity. *See Harris,* 973 F.2d at 337. The preferred manner of proceeding, as the eleventh circuit has artic-

ulated in *United States v. Hampton,* 775 F.2d 1479 (11th Cir.1985), is to establish certain precautions to insulate those individuals apprised of the immunized testimony:

> Unless the government relies solely upon evidence obtained prior to the immunized testimony, the principles of *Kastigar* generally require (as a practical matter) a showing that prosecuting officials and their agents were aware of the immunity problem and followed reliable procedures for segregating the immunized testimony and its fruits from officials pursuing any subsequent investigations.

*Id.* at 1490 (citation omitted); *see State v. Ely,* 708 A.2d 1332, 1340 (Vt.1997) (observing that where there is widespread access to immunized evidence "it will be difficult, if not impossible, for a prosecutor . . . to show non-use" and recommending that procedures be adopted "that will limit access to immunized evidence, and that persons who investigate or prosecute immunized witnesses be separate from those who had access to the immunized testimony").

▆ The record is clear in this case that both the primary investigator for the State Police, Sergeant Alkire, and the individual who prosecuted the case, Walt Weiford,[38] were never removed from involvement after the use immunity agreement was signed. The trial court found that neither of these individuals had knowledge of the use

---

**35.** Although Defendant had provided Mrs. Hively's name as a witness to his school board attendance, see *supra* note 20, the trial court determined that her testimony regarding spotting Defendant's truck unattended between 5:30 and 6:00 p.m. on the date of the murders was not connected to any information that Defendant had provided.

**36.** One other ground upon which Defendant relies to assert a violation of *Kastigar* was the State's cross-examination of Defendant by reference to a statement given to police under Defendant's grant of use immunity. At trial, when Defendant testified that he had not seen Bill McCoy on the date of the murders at Droop Mountain Park on his way home from work, his prior statement was briefly used as a tool to refresh his recollection. Defendant argues that under *New Jersey v. Portash,* 440 U.S. 450, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979), the State's use of Defendant's statement constituted reversible error. We do not find *Portash* to be controlling as the holding in that case was that testimony given before a grand jury under a grant of immunity cannot be constitutionally used to im-

peach a defendant at a subsequent proceeding. *Id.* at 459–60, 99 S.Ct. 1292. Given the limited and completely non-hostile manner in which Defendant's prior immunized statement was used at trial merely to refresh his recollection, we conclude that this use does not come within the *Kastigar* concerns regarding use of compelled testimony. Furthermore, there was no mention during the cross-examination of the previous statement having been made under a grant of immunity.

**37.** We are not unmindful of the fact that many rural areas in our state do not have the luxury of being able to transfer investigatory or prosecutorial duties to other police officers or prosecutors. Many West Virginia counties have only part-time prosecuting attorneys; a number of West Virginia counties have three or fewer deputies.

**38.** While Mr. Weiford was an assistant prosecutor at the time, he signed the use immunity agreement.

immunity agreement until after Defendant was indicted for the murders in 1992 or 1993.[39] As the First Circuit Court of Appeals observed in *United States v. Serrano,* 870 F.2d 1 (1st Cir.1989) the purpose of the Fifth Amendment's protection against compelled testimony is not "automatically frustrated by the government's mere exposure to immunized testimony." *Id.* at 17. But, rather, it is the *use* that is made of such immunized testimony that calls into play the protections first enunciated in *Kastigar. See Harris,* 973 F.2d at 338 (citing *United States v. Caporale,* 806 F.2d 1487, 1518 (11th Cir. 1986) *cert. denied,* 482 U.S. 917, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987)). Since Sergeant Alkire and Mr. Weiford played an ongoing role in this case, it is difficult to assume that they were investigating this case without some awareness of Defendant's alibi defense. And based on this arguable cognizance of Defendant's alibi, it is impossible to rule out the possibility that such knowledge played some role, no matter how minor or insignificant, in how the prosecution of this case progressed.[40] Because we do not adopt the position announced by the Eighth Circuit in *McDaniel* regarding extending the protections of *Kastigar* to nonevidentiary uses, we cannot conclude that this intellectual awareness alone was sufficient to taint the entire prosecutorial process.[41] As the court observed in *United States v. Byrd,* 765 F.2d 1524 (11th Cir.1985), "[t]he government is not required [in a *Kastigar* proceeding] to negate all abstract 'possibility' of taint. Rather, the government need only show by a

preponderance of the evidence that, in fact, the evidence used was derived from legitimate, independent sources." *Id.* at 1529 (quoting *United States v. Seiffert,* 501 F.2d 974, 982 (5th Cir.1974)).

Based on the foregoing, we affirm the decision of the Circuit Court of Greenbrier County.

Affirmed.

**39.** The record indicates that Defendant's counsel made Mr. Weiford aware of the use immunity agreement by letter dated January 8, 1993, just before the second indictment was returned against Defendant.

**40.** We do observe, however, that the significant time lapse between the various investigations which were conducted by separate entities in this case somewhat reduces the likelihood that Defendant's alibi information first provided in 1983 was used when the investigation was renewed seven or eight years later. The investigation that began in 1990 or 1991 appears to have sprung up anew and to have been fueled almost entirely by new leads that were entirely independent of any information that Defendant may have ever provided to the state police in 1983.

**41.** As the Fifth Circuit Court of Appeals observed in *Serrano,*

To what extent the Fifth Amendment's privilege against self-incrimination bars the nonevidentiary use of immunized testimony is a difficult question. Neither *Murphy [v. Waterfront Comm'n,* 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964)] nor *Kastigar* addressed this question, and lower courts have disagreed on the issue. The commentators are also divided over this issue.

870 F.2d at 16–17 (rejecting notion "that all nonevidentiary use necessarily violates the Fifth Amendment" and citing federal court decisions as split on the issue of non-evidentiary use of immunized testimony); *see Ely,* 708 A.2d at 1339–40 (discussing split of authorities regarding nonevidentiary use); *State v. Gault,* 551 N.W.2d 719, 724–25 (Minn.Ct.App.1996) (recognizing divergence of opinion on nonevidentiary use of immunized testimony).